**FACTOFRANCE HELLER, Plaintiff,**

v.

**I.P.M. PRECISION MACHINERY COMPANY and Josef Blechner, Defendants.**

No. 84 C 3987.

United States District Court, N.D. Illinois, E.D.

Feb. 7, 1986.

Kenneth B.. Drost, Rachel F. Best, Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for plaintiff.

Jerome Rotenberg, Norman L. Hafron, Rosenfeld, Rotenberg, Schwartzman, Hafron & Shapiro, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Factofrance Heller ("Factofrance") has filed a four-count Amended Complaint (the "Complaint") in this diversity action against I.P.M. Precision Machinery Company ("IPM") and Josef Blechner ("Blechner"), charging:

 1. breach of contract (Count I);

 2. unjust enrichment (Count II);

 3. conversion of Factofrance's property (Count III); and

 4. conspiracy to convert Factofrance's property (Count IV).

Factofrance has now moved under Fed.R. Civ.P. ("Rule") 56 for summary judgment against IPM and Blechner. For the reasons stated in this memorandum opinion and order, that motion is granted in part and denied in part.

### Facts [1]

Factofrance is a French corporation in the factoring business—financing accounts receivable—for various European companies. Illinois corporation IPM acts as an independent sales representative for domestic and foreign manufacturers of high precision machine tools, including Societe d'Innovations Techniques ("SIT"). Blechner owns or controls 100% of IPM's stock (Answer to First Amended Complaint ["Ans."] ¶ 15).

On June 9, 1976 Factofrance and SIT entered into a factoring contract (P.Ex.4). They later amended that contract to include accounts receivable generated by SIT's transactions with IPM (Complaint ¶ 7; Ans. ¶ 7).

In May 1980 Blechner met Daniel Dusseau ("Dusseau") and Mary Croft ("Croft") —two representatives of SIT—at a Chicago trade show (Blechner Dep. 17–18). Dusseau and Croft indicated SIT needed a United States sales and service agent (id. at 21–22). Several months later Blechner toured SIT's factory in Cholet, France and IPM and SIT tentatively agreed "to work together" (id. at 23).

During the summer of 1981 IPM agreed to buy two machines from SIT (id. at 38, 42):

---

**1.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose this Court must view the evidence in the light most favorable to the nonmovants—here IPM and Blechner. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984).

1. a 650 creep feed grinder ("RPM 650"); and

2. a Universal O.D. grinder ("RCE 700").

SIT shipped the machines to IPM and IPM paid SIT in full (*id.* at 43, 131).

After demonstrating both machines at an October or November 1981 trade show, IPM arranged to sell the RPM 650 to Waltz Bros., Inc. ("Waltz") (*id.* at 52–54). Dusseau represented to IPM and Waltz that SIT could modify the RPM 650 to conform to Waltz' requirements (*id.* at 67–70). Nonetheless, a series of tests conducted by IPM in 1982 revealed the RPM 650 did not meet Waltz' specifications (*id.* at 77–80).

In June 1982 Blechner again visited SIT representatives in France. SIT agreed:

1. to furnish a different machine to IPM—an "RPM 1000"—if the RPM 650 could not meet Waltz' requirements (*id.* at 83, 85);

2. to allow IPM to exchange the original RPM 650 for a new RPM 650 machine (*id.*); and

3. to pay 60% of the cost of a September 1982 trade show (*id.* at 109–10).

Later that summer IPM and SIT concluded the RPM 650 could not satisfy Waltz' needs (*id.* at 92). IPM and SIT then agreed IPM would return the RPM 650 to France with several other machines SIT intended to ship back to France after they had been demonstrated at the September 1982 trade show (*id.* at 92–93).

During the summer of 1982 IPM also ordered the RPM 1000 to install at Waltz (*id.* at 94–96) and an R650 HLT to sell to Durand Bros. Glass Mfg. Co. ("Durand") (*id.* at 108–09, 128–29; P.Ex.6). SIT first demonstrated the RPM 1000 at the September 1982 trade show before turning it over to IPM (Blechner Dep. 96). SIT shipped the R650 HLT directly to Durand (*id.* at 108–09). SIT never sent IPM a new RPM 650 to replace the original RPM 650 rejected by Waltz (*id.* at 128).

On July 23, 1982 SIT sent three invoices (the "Invoices") to IPM:

1. No. 4335 (Complaint Ex. A) covered the R650 HLT shipped to Durand.

2. Nos. 4338 and 4339 (Complaint Exs. B and C) covered the RPM 1000 and its accessories.

All invoices reflect the agreed purchase price (in French francs) of the machines (P.Ex.7 and 8): 151,648 francs for the R650 HLT and an aggregate of 615,644 francs for the RPM 1000, or a total of 767,292 francs. IPM never paid SIT for those machines.

Factofrance later purchased the accounts receivable represented by the Invoices. On August 30, 1982 SIT notified IPM of that factoring contract and directed IPM to pay Walter Heller & Company, Inc. ("Heller"), Factofrance's United States agent (P.Ex.9). On August 31, 1982 Factofrance itself sent a similar notice and direction to IPM (P.Ex. 10). IPM received those notices on September 7 (P.Ex.6). It never paid Heller or Factofrance for the machines covered by the Invoices (Blechner Dep. 131).

In September 1982 Durand paid IPM $46,341 for the R650 HLT (P.Exs.6, 14). On October 6, 1982 IPM telexed SIT, rejecting both the RPM 650 and the RPM 1000 (P.Ex.11). Nonetheless IPM later sold the RPM 1000 to Waltz for $120,000 (P.Ex.12)—$24,216 less than the price Waltz had originally agreed to pay (P.Ex.5).

IPM had agreed to bill SIT for its share of the September 1982 trade show expenses before SIT would be required to remit payment (Blechner Dep. 110). In June and October 1981 IPM billed SIT for its share of booth rental costs (*id.* at 148, 150; Dep.Ex.7,9). SIT paid its share of those costs in full (Blechner Dep. 151). IPM did not bill SIT for the remaining trade show costs until some time after the trade show (*id.*).

In early 1983 SIT entered bankruptcy proceedings in France. IPM attempted to send the rejected RPM 650 back to SIT, but the freight forwarder was told to return the machine to this country and to find a buyer (*id.* at 110–11). Blechner himself bought the machines from the freight forwarder (*id.*).

### Count I: Breach of Contract

Factofrance asserts—and IPM agrees—the Illinois version of Uniform Commercial Code ("UCC") Article 9, Ill.Rev.Stat. ch. 26, ¶¶ 9–101 to 9–507,[2] governs IPM's liability to Factofrance on the two assigned Invoices. Section 9–318(1) outlines the defenses an account debtor[3] can assert against the assignee of an account:

> Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9–206 the rights of an assignee are subject to
>
> > (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
> >
> > (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

In that respect Factofrance contends:

1. IPM cannot assert any defense arising from the contract—evidenced by Invoice 4335—to buy the R650 HLT.

2. IPM can assert a breach of warranty claim arising out of the contract—evidenced by Invoices 4338 and 4339—to buy the RPM 1000, but IPM's damages for that claim are limited to the difference between (a) the amount Waltz originally agreed to pay for the RPM 1000 and (b) the amount Waltz eventually paid in fact.

3. IPM's remaining claims against SIT—those not arising out of the sales contracts themselves—accrued after IPM received notice of the assignment and cannot be asserted against Factofrance.

Factofrance also seeks to hold Blechner personally liable for IPM's debts.

### 1. Claims Arising From the Contracts Between SIT and IPM

IPM does not dispute any of the critical facts relating to the R650 HLT shipped by SIT (Blechner Dep. 108–09; P.Ex.6):

1. Durand actually received and installed that machine.

2. Durand never rejected it.

3. Durand paid IPM for it in full.

Hence IPM cannot assert against Factofrance any claims or defenses arising out of its contract to purchase the R650 HLT. IPM does not quarrel with that result.

■ IPM also does not dispute (Blechner Dep. 109) its eventual sale of the RPM 1000 to Waltz despite its earlier purported rejection (P.Ex.11) of that machine. Under Sections 2–606(1)(c) and 2–607(1), that sale was an "act inconsistent with the seller's ownership" and constituted an acceptance of the RPM 1000 obligating IPM to pay for the machine. *Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F.Supp. 432, 433–34 (N.D.Ill.1982).

■ Although Illinois case law suggests IPM's sale of the RPM 1000 might have obligated IPM to pay the full contract price to SIT (see *Ozite Corp. v. F.C. Clothier & Sons Corp.*, 130 Ill.App.2d 716, 719, 264 N.E.2d 833, 835 (4th Dist.1970)), Factofrance Mem. 14 has acknowledged IPM can assert a breach of warranty claim arising out of the sales contract.[4] Section 2–714(2) establishes the measure of damages IPM may offset against its liability:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the val-

---

**2.** All further citations to Illinois' UCC will simply take the form "Section—."

**3.** Section 9–106 defines "account":

> "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

Section 9–105(a) defines "account debtor":

> "Account debtor" means the person who is obligated on an account, chattel paper or general intangible.

SIT's right to payment for each piece of equipment sold to IPM was an "account." Hence IPM—the entity obligated to pay for those goods—is an "account debtor."

**4.** Section 2–607(2) provides in part:

> [A]cceptance does not of itself impair any other remedy provided by this Article for nonconformity.

ue of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

Factofrance contends the objective measurement of the difference in value is the difference between the $144,216 Waltz originally agreed to pay IPM for the RPM 1000 (P.Ex.5) and the $120,000 reduced price Waltz eventually paid (P.Ex.12).[5]

IPM accepts that measure so far as it goes, but argues it should also recover its expenses incurred in putting the RPM 1000 in working order. Factofrance R. Mem. 4 n. 1 retorts briefly that added measure of damages would confer a double recovery on IPM.

Factofrance's position on that score is unsound on its face. Section 2–714(2) speaks of the "value of the goods accepted." But that value—the best evidence of which is the price paid by arms-length purchaser Waltz—was not $120,000 if repairs had to be made to the RPM 1000 before that price could be realized. Whether such repairs were to be made by the buyer (who would then pay that much less for the machine) or by IPM in order to obtain the $120,000 price, in either case the "value of the goods accepted" "at the time and place of acceptance" would be $120,000 minus any out-of-pocket costs required to repair the RPM 1000.

 Any such possibility, though, is really beside the mark. In Rule 56(e) terms, IPM has failed to "set forth specific facts" as to any claimed out-of-pocket repair costs. *Walker v. Hoffman,* 583 F.2d 1073, 1075 (9th Cir.1978) (quoting *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972)) teaches a litigant cannot hold back evidence on a summary judgment motion:

> The non-movant has an affirmative duty to come forward to meet a properly supported motion for summary judgment:
>> A party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for

in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to "smoke out" the facts so that the judge can decide if anything remains to be tried.

Accord, *Publishers Resource, Inc. v. Walter-Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985).

This Court has frequently pointed out summary judgment is a substitute for trial, dependent on the nonexistence of controverted facts to be resolved by the factfinder (whether jury or judge). Just as a litigant cannot say, post-verdict, "Oh by the way, here's some evidence I failed to put in during the trial that would have reduced the judgment against me," so the target of a plaintiff's summary judgment motion cannot fail to put its evidence in before judgment is rendered. Hence IPM's mere assertion in its briefing about repair costs—wholly unsubstantiated in terms of admissible evidence—cannot operate to reduce the damages shown by Factofrance's proofs.

### 2. Claims Unrelated to the Contracts Between SIT and IPM

IPM urges its right to assert against Factofrance two additional claims not arising out of the contracts evidenced by the Invoices assigned to Factofrance:

1. a claim for damages for the defective RPM 650; and

2. a claim for the trade show expenses SIT agreed to pay.

Factofrance responds those claims accrued after IPM received notice of the assignment, so that Section 9–318(2) bars their assertion against Factofrance.

#### (a) RPM 650

 Factofrance does not dispute the RPM 650 was defective: It failed to meet Waltz' requirements despite SIT's assurances. Hence IPM has a claim for breach of warranty in the sale of the RPM 650.

---

5. That measure of damages in effect compensates IPM for its lost profits. Illinois law considers lost profits a proper element of damages

for breach of warranty. *Burrus v. Itek Corp.,* 46 Ill.App.3d 350, 358–59, 4 Ill.Dec. 793, 360 N.E.2d 1168, 1173 (3d Dist.1977).

Section 2–725(2) establishes the time of accrual of that claim:

A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

IPM's claim for breach of warranty thus accrued when SIT delivered the defective RPM 650 in early 1982—well before IPM received notice of the assignment to Factofrance in September 1982.

Factofrance insists IPM and SIT entered into a "novation" of the sales contract when (1) IPM agreed to wait until after the September 1982 trade show to return the RPM 650 and (2) SIT agreed to send IPM a new RPM 650 machine. From that perspective, Factofrance says, IPM's claim did not accrue until SIT breached that second contract to replace the RPM 650 and IPM wrote to SIT rejecting the machine in October 1982.

But Factofrance glosses over the controlling fact that Section 2–725(2) speaks of the time of accrual in terms of "breach." IPM's agreement to return the RPM 650 at a later date, rather than insisting on immediate money damages, did not somehow extinguish (and it certainly did not waive) SIT's breach of warranty. All the parties did was to agree to substitute one remedy for that breach—replacement of nonconforming goods—for another remedy—money damages. If the parties had agreed on the amount of damages but had given SIT added time to make payment, surely Factofrance could not assert *that* as deferring the accrual of IPM's breach of warranty claim. And the situation here is no different. IPM's claim—the breach of warranty—never changed. Because that claim accrued before IPM received notice of the

assignment, IPM may assert that claim against Factofrance.

*(b) Trade Show Expenses*

■ SIT obligated itself in June 1982 to pay 60% of IPM's trade show expenses, and IPM asserts its claim for those expenses therefore accrued at that time. But "accrual" of a "claim" in Section 9–318(1)(b) terms bespeaks more than the existence of an unripened obligation. Though there is little legislative history or case law on point, the official UCC Comment says the subsection "makes no substantial change in prior law." And the common-sense usage of the term "accrual" would appear to embody the same "cause of action" concept embraced in Section 2–725(2) and discussed in the preceding section. As *Seattle First National Bank v. Oregon Pacific Industries, Inc.*, 262 Or. 578, 500 P.2d 1033, 1035 (1972) put it:[6]

"Accrue," aside from its fiscal use, generally is used in the law to describe when a cause of action comes into being. Its chief use is to determine when the statute of limitations commences. We believe it is advisable to use "accrue" in the Code in its usual sense; that is, a claim or set-off accrues when a cause of action exists.

Thus "accrual" of the "claim"—a "cause of action" notion—necessarily involves a *breach* of an obligation rather than its mere existence. And by definition no breach of SIT's duty to pay the trade show expenses could arise until IPM billed SIT for its proportionate share and SIT did not pay. *See State Department of Agriculture v. Ackerman*, 34 Ill.App.3d 796, 798–99, 341 N.E.2d 48, 50–51 (5th Dist.1975). Because the amount of the expenses could not even be known until the trade show (after the notice of assignment), and because in any event IPM did not bill SIT until several months after the September trade show (Blechner Dep. 151), SIT's refusal to pay—and therefore IPM's claim

---

**6.** IPM–Blechner Mem. 4 also recognizes *Seattle First National Bank* as persuasive authority, seeking to cite that case to their own benefit.

for breach of the expense-sharing agreement—did not "accrue" until after IPM had received notice of the assignment to Factofrance. IPM cannot assert that claim against Factofrance.

### Count I: IPM as Blechner's Alter Ego

■ After an extended period of digression (initiated by *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157 (7th Cir. 1963)), our Court of Appeals has now made it plain in *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 570–71 (7th Cir.1985) that Illinois law does (as it must under *Erie v. Tompkins*) provide the rule of decision as to "piercing the corporate veil" in Illinois-based diversity cases. *Gallagher v. Reconco Builders, Inc.*, 91 Ill.App.3d 999, 1004, 47 Ill.Dec. 555, 415 N.E.2d 560, 563–64 (1st Dist.1980) (citations omitted) teaches:

> [A] corporate entity will be disregarded and the veil of limited liability pierced where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of a governing or dominating personality. . . . For the doctrine traditionally known as the "piercing of the corporate veil" to apply two requirements must be met: first, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and second, circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

Factofrance seeks to hold Blechner personally liable for IPM's obligation on those grounds.

To portray IPM as Blechner's "alter ego," Factofrance asserts two "facts":

1. Blechner owned or controlled 100% of IPM's stock.

2. IPM was inadequately capitalized.

Blechner does not dispute his ownership and control of IPM (Ans. ¶ 15). However,

Factofrance's generalized blanket assertion that IPM lacked sufficient capital to meet its potential liabilities is unsupported by any factual showing of undercapitalization when IPM contracted with SIT. At worst Factofrance is guilty of a total failure of proof, and at best the issue is too fact-bound to resolve at the summary judgment stage. At a minimum, Factofrance has failed to show the absence of a material fact on that score.

### Other Counts

This opinion's prior discussion has established Factofrance is entitled to summary judgment against IPM on its breach of contract claim, subject of course to any valid setoff. It is therefore unnecessary to discuss Factofrance's alternative theories of recovery, none of which would appear to enlarge IPM's potential liability. And Count IV, the only one that could support possible liability on Blechner's part, has not even been briefed or argued by Factofrance.[7]

### Applicable Exchange Rate

In *Newman-Green, Inc. v. Alfonzo-Larrain R.*, 612 F.Supp. 1434, 1441 (N.D.Ill. 1985) this Court identified the two approaches, springing from three terse opinions written by Justice Holmes in the 1920s, that have developed to determine the proper exchange rate for converting into dollars an obligation measured in foreign currency:

> One line of cases looks mechanically to the place of payment, applying the breach-day rule when payment is due in the United States and the judgment-day rule when it is due in a foreign country. By contrast, a second line of cases looks instead to the jurisdiction in which the cause of action arises, applying the breach-day rule if the claim arises under American law and the judgment-day rule if it arises under foreign law.

Each of those formulations points to the breach-day rule here:

---

7. Moreover Count IV, like Count III, depends on the existence of a security interest in the goods having been given Factofrance. That is an issue disputed by the litigants, and neither has seen fit to furnish this court with a translation of the critical contract (written in French).

1. Both notices to IPM require payment in the United States to Factofrance's United States agent, Heller (P.Ex.9 and 10).

2. Factofrance's right to payment arises under American law: the Illinois version of the UCC.

IPM does not dispute the application of the breach-day rule.

### Conclusion

There is no genuine issue of material fact as to, and Factofrance is entitled to judgment as a matter of law on, Count I (the United States dollar equivalent of 767,-292 French francs, calculated according to the franc-dollar rate of exchange in effect on the date of IPM's breach) subject to reduction by:

1. the $24,216 difference in value ascribable to the RPM 1000; and

2. the amount of IPM's breach of warranty claim on the defective RPM 650.

Both litigants should promptly confer and then apprise this Court of the appropriate time for any necessary evidentiary hearing on the latter item (and on the rate of exchange, if for some reason they cannot agree on that subject). Factofrance's remaining efforts to obtain summary judgment are denied.