SPIRIT OF EXCELLENCE, LTD., Plaintiff-Appellant and Cross-Appellee, v. INTERCARGO INSURANCE COMPANY, Defendant-Appellee and Cross-Appellant (Abaco International Shippers, Inc., Defendant-Appellee).

First District (4th Division) No. 1—00—3523

Opinion filed September 26, 2002.

Childress & Zdeb, Ltd., of Chicago (Michael Childress, Scott Morgan, and Bridget Boland, of counsel), for appellant.

Marwedel, Minichello & Reeb, P.C., of Chicago (Warren J. Marwedel, Robert L. Reeb, and Julia A. Martin, of counsel), for appellee Intercargo Insurance Company.

Law Offices of David A. Izzo & Associates, of Chicago (Michael J. Higgins, of counsel), for appellee Abaco International Shippers, Inc.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff-appellant and cross-appellee, Spirit of Excellence (SOE), through a trustee in bankruptcy, appeals the grant of a motion to reconsider a prior summary judgment favoring SOE, and entry of summary judgment for defendant-appellee and cross-appellant, Intercargo Insurance Company (Intercargo). SOE also appeals the order in favor of defendant-appellee, Abaco International Shippers, Inc. (Abaco), dismissing SOE's third-amended complaint. On cross-appeal, Intercargo challenges the circuit court's finding that SOE had an insurable interest in certain property under its policy.

The issues to be considered on appeal will be limited to those concerned with SOE's standing and damages and, on cross-appeal, to the circuit court's grant of summary judgment for SOE on the insurable interest question.

As recounted by SOE, the final orders entered in this case terminated years of litigation, including motions to dismiss, motions *in limine*, 27 depositions, motions for summary judgment and other proceedings. Only those facts essential to deciding this appeal, gleaned from the described proceedings, need be set forth.

On December 10, 1994, two Russian companies, Too Objective

(Objective) and Too Runo (Runo), contracted to export used American vehicles to Rostov, Russia. Runo and Objective agreed to buy 200 to 300 used automobiles in the United States, remove the engines and transmissions and ship them to Russia, where they would be reassembled (the project). The contract stated that Objective, the "supplier," would provide all necessary documents, including insurance policies. Runo would prepay all project funds, including all costs for the purchase of the automobiles, their disassembly, packing them into ocean containers, transportation and shipping, equipment for reassembly and insurance. After the vehicles were reassembled and sold in Russia, Objective would get 20% of the profits and Alexandre Grigorian, Objective's principal, would receive 10%.

Previously, SOE, an exporter of goods from the United States to Russia, contracted in writing with Objective and Grigorian, nonparties to this lawsuit, for the purpose of introducing "goods [consisting of used automobiles] and services provided by [SOE] into the consumer market of Russia as well as export of goods and services from Russia" in furtherance of the project. Objective would act as a "middleman" by facilitating the transactions with Runo in Russia. The contract made SOE responsible for "[a]ppropriately packing the goods," and "[t]he packing should provide for the safety of the goods and prevention [of] their damages at transport." Objective would arrange for prepayments by Runo of the goods by means of noncash bank transfers to SOE's account. Upon the shipment of goods, SOE was required to provide Objective with a copy of the insurance policy and a statement of the total insurance amount.

Runo prepaid SOE for all the following costs of sale: (1) SOE's purchase cost for the used cars in the United States; (2) SOE's costs in disassembling the automobiles; (3) SOE's costs in paying a shipper selected by SOE to have the cars packed within ocean containers for transportation to Russia; and (4) all the costs associated with transporting by rail and ocean, and insuring the cars. Runo paid SOE in advance for these costs by wiring funds directly to SOE, in the amount of $5 million.

In early 1995, Runo began wiring funds from Doninvest Bank in Russia totaling $100,000 to $250,000 in weekly stages over a four-month period directly to SOE's bank account. Grigorian and Oleg Gryzlov, Runo's principal, determined the criteria for purchasing the vehicles, including the year, make, model and mileage. SOE began buying the specified vehicles from dealerships and auctions. Separate commercial invoices reflecting monetary values of the automobile bodies to Runo and the engines and fluids to two other Russian consignees, Too Leks (Leks) and Too Kristall (Kristall), indicated that these goods

were sold to Runo and the other parties in order to present proof of possession to Russian customs agents upon their arrival in Rostov.

SOE hired Abaco, an Illinois corporation engaged in the business of stow, design and building of custom containers for the overseas transport of goods to foreign destinations, to design and custom build containers sufficient to withstand the normal rigors of truck, rail and ocean transit. Abaco also arranged the bookings with the steamship lines in a freight forwarding capacity. SOE had no written contract with Abaco, but previously had done business with it for other shipping projects.

SOE directed Abaco to place four cars in each container for a total of 81 containers. Although the titles of the vehicles initially were in SOE's name, SOE issued its commercial invoices evidencing the vehicle sales to Runo prior to transportation of each container. The commercial invoices do not state the precise terms of sale; however, according to the deposition testimony of SOE's president, Michael Vilner, there was an oral agreement that the sale was on a "CIF" basis, including cost, insurance and freight prepaid by the purchaser, Runo. The prepayment of all costs also had the effect of rendering the sale CIF.

Abaco held the Intercargo open marine policy which allowed the privilege of countersigning certificates of insurance as part of a profit-sharing agreement, to be issued strictly in accordance with the terms and conditions of the policy. Abaco issued 81 such certificates to SOE, showing their issuance "for the account of Abaco" and loss payable to SOE. Most of the containers each were insured in the amounts of $17,600 or $17,995.

The containers were transported in a series of shipments over a five-month period, between February 7, 1995, and July 7, 1995. The first container departed Abaco's premises by truck and rail transit to Montreal, Canada, where it was received by Cast Lines, which issued bills of lading listing Runo as the consignee. The bills of lading state that "[s]ubject to Section 7 of conditions of applicable bill of lading, if the shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement." The area provided for the consignor's signature was left blank. The bills of lading noted that charges for shipment were to be prepaid. In addition, the bills of lading defined "loss" as "shortage, non-delivery, misdelivery, damage, deterioration, and all physical or consequential loss or damage of any nature whatsoever to or in connection with GOODS or any other thing referred to."

The first containers began arriving in Rostov in April 1995 and were accepted by Runo. There was minor damage to the automobiles

in the first two containers opened, but significant damage to the vehicles was observed in the next 79 containers. There is no evidence in the record, however, that Runo ever rejected any shipped vehicle.

Konstantin Kaymakov, president of Tamga-Ug Insurance Company in Rostov, agent for the insurance company listed on Intercargo's insurance certificates, testified by deposition that he is familiar with methods of packing and securing automobiles for shipment. Kaymakov testified that Runo contacted him in April 1995 about the damaged vehicles. He surveyed all the containers and prepared reports of damages, including rubbed off paint, scratches, dents, broken windows and mirrors and dented bumpers. From his observations, Kaymakov concluded that the packaging of the vehicles was improper, as evidenced by broken wooden planks supporting vehicles on the upper tiers and torn nylon straps securing the automobiles. In further support of his opinion was the fact that the automobiles were shipped at different times over various routes, but the damages were similar. Kaymakov limited his communication to Runo officials, who paid him for the surveys. He did not analyze the cost of repairing the vehicles.

Alexander Bondarev, a representative of Runo, testified by deposition that Runo hired various companies in Russia to repair the damages to the cars, which had been noted in the survey reports upon arrival, and Runo paid for all the repairs. All the invoices for these repairs are addressed to Runo as the party that ordered and paid for the repairs. After the repairs were completed, the vehicles were sold by Runo to purchasers in Russia. Thereafter, Runo communicated directly to Intercargo its position that "all losses according to the Contract was incured [sic] by company 'Runo,' " on April 12, 1996.

Grigorian testified by deposition that Runo and SOE conducted their business through Objective. Runo decided how much insurance to purchase. Runo paid a total of $1.9 million for all the repairs made and wanted Objective to reimburse it in that amount. An assignment of claims from Runo to Objective, dated March 20, 2000, assigned all legal and equitable rights, claims, demands, actions, causes of action, suits, judgments and orders against Abaco and Intercargo arising out of the damages to the automobiles shipped in the 81 containers. SOE paid Grigorian $150,000 for his project services.

Michael Vilner, president of SOE, testified by deposition that SOE conducts its business on a consignment basis. He met with Grigorian, Gryzlov and Mark Von Ebers, general manager of Abaco, where insurance coverage was discussed. Von Ebers explained the concept of partial insurance, which provides for the recovery of loss of only that percentage covered. According to Vilner, Abaco issued the insurance certificates after the vehicles were packed into the containers. Vilner

testified that he instructed Von Ebers to provide 50% insurance coverage for the shipments, as requested by the consignee, Runo.

Vilner claimed he did not know if money wired to SOE came from Objective or Runo. SOE had no contact with Intercargo during the packing process. Grigorian and Gryzlov called Vilner immediately upon discovering damage to the vehicles. SOE was to have filed the insurance claim, but Runo possessed the insurance certificates. After Vilner received the initial telephone call regarding damages, he contacted Von Ebers, who gave Vilner the telephone number of Tamga-Ug, the local insurance representative in Rostov. Vilner telephoned Grigorian and gave him the information. Vilner did not know how many containers were shipped after the initial report of damages. He was told by Von Ebers that the vehicles were packaged correctly.

According to Vilner, SOE profited from the project in the amount of $365,000. SOE and Abaco both filed for bankruptcy in 1997. Objective, Runo's assignee, filed a bankruptcy claim against SOE in the amount of $1.9 million.

Von Ebers, a 20-year Abaco employee, testified by deposition that when the containers left Abaco's warehouse, he was given bills of sale for the cars to satisfy United States customs requirements for proof of ownership, which listed SOE as the owner. Regarding procurement of insurance for SOE, Von Ebers did not deal directly with Intercargo; rather, all insurance issues were handled by Trade Insurance Services, Abaco's insurance broker.

Alan Spear, of Intercargo, testified by deposition that he is a marine claims adjuster and loss prevention analyst for Intercargo. He performed a "failure analysis" for this project. A February 7, 1996, letter from Spear to Runo and SOE representatives acknowledged the receipt of 90 claims. Spear stated that the insured knew that a pattern of loss was occurring from April 28, 1995, and did nothing to change the circumstances. Ten shipments may have left after April 29, 1995. Spear testified that he was told by Von Ebers that the damage was minor, so the method of packaging was not changed. If he had known about the damage, he would have stopped the last 10 shipments.

An April 9, 1996, report prepared by Spear noted that as the damaged vehicles were unloaded from their containers, they were taken to an automotive plant where the engines were reinstalled. During this time, the cars were inspected by a repair company, Transtourservice, which developed estimates for the repairs. The Transtourservice estimates were between 30% and 50% over the amount of average prices. Transtourservice made the repairs. Runo sold the repaired cars at random prices, but did not profit because the community had heard about the damages.

A letter from Spear to SOE, dated May 8, 1996, denied coverage by Intercargo for all claims due to the following: (1) late notice of the claims; (2) the named insured, SOE, had no insurable interest in the goods at the time of loss; (3) an exclusion for improper packing applied; (4) coverage for damages of goods shipped to Russia ceased 30 days after arrival of the goods in port; (5) an exclusion for used merchandise applied; (6) SOE failed to make immediate claims against the carriers; (7) SOE's claims were time-barred; (8) the certificates were void because SOE breached its obligation of utmost good faith and fair dealing with Intercargo; and (9) SOE vastly underinsured the shipments.

On May 20, 1996, SOE filed its initial complaint against Intercargo for breach of contract and later added Abaco as a defendant in an amended complaint, alleging negligence. In its third-amended complaint, SOE sought damages for repair costs of $924,356, an amount later increased to $1,912,863.32.

In September 1997, a creditor unrelated to the instant case filed an involuntary petition against SOE pursuant to chapter 7 of the United States Bankruptcy Code (11 U.S.C. § 701 *et seq.* (1994)), naming SOE as the debtor. The bankruptcy case currently is pending in the United States Bankruptcy Court in the Northern District of Illinois. Objective thereafter also filed a bankruptcy claim against SOE.

On February 3, 1999, Abaco moved for summary judgment with respect to the negligence count, claiming that SOE could not prove any facts to support the existence of damages. The circuit court denied the motion on May 25, 1999, finding that there was a question of fact as to who owned the automobiles, and set the case for trial on June 21, 1999, which later was stricken. Thereafter, SOE and Intercargo cross-moved for summary judgment on various grounds, including SOE's inability to prove damages. Abaco moved to reconsider the May 25, 1999, order denying its summary judgment motion.

On September 10, 1999, the circuit court ruled on all then-pending motions, denying Abaco's motion to reconsider and Intercargo's summary judgment motion. The court granted SOE's summary judgment motion, finding that SOE had an insurable interest in the automobiles, as a matter of law. During the hearing, however, the court stated that "the real party in interest is nowhere before me," referring to Runo. The court also expressed concern with regard to an issue of standing.

On April 14, 2000, the circuit court ruled on certain motions *in limine,* granting Intercargo's motion to bar evidence of repair invoices on the basis of hearsay. The court granted Abaco's motion *in limine* to bar SOE from "presenting any evidence of Runo's or its assigns' payments to repair the damaged automobiles." In its motion, Abaco reiter-

ated for the court that Runo paid for the entire project and the repair of the cars, arguing that, although SOE claimed that it was damaged in the amount of $1,912,863.32, SOE itself had suffered no damages and, therefore, had no standing to sue Abaco. In its findings barring evidence of repair payments, the court stated that the claims brought by SOE against Abaco actually were claims that belonged to SOE's creditors. The court ruled that the claims of SOE's creditors were personal and that SOE lacked standing to bring these claims against Abaco.

On July 31, 2000, Intercargo moved to reconsider the order denying its motion for summary judgment. Abaco filed its motion to dismiss on August 30, 2000.

On September 7, 2000, the day before trial, Intercargo noticed an emergency motion for hearing, requesting leave to take an evidence deposition of an out-of-state witness. At the hearing on the motion, the circuit court informed counsel for the parties that there would be no trial. Thereafter, the court granted Intercargo's motion to reconsider the September 1999 ruling on its summary judgment motion and entered summary judgment favoring Intercargo, and also granted Abaco's motion to dismiss. In its findings, the court ruled that SOE could not establish that it had suffered any damages that could be submitted to a jury, as previously argued by Intercargo. That argument had asserted that all losses were personal to SOE's third-party creditors, including Objective as assignee of Runo's claims against SOE. The court found that all matters as to all parties were disposed of and that the order was final and appealable.

On September 25, 2000, SOE moved to vacate the orders entered on September 8, 2000, and for leave to make an offer of proof as to testimony to be given by Pavel Panov and Michael Simon regarding repair costs for the damaged vehicles. The circuit court denied the motion, but granted SOE leave to file the deposition testimony of Panov and Simon, for the record. SOE timely appeals and Intercargo cross-appeals.

■ A reviewing court exercises *de novo* review when determining whether the circuit court properly granted a motion for summary judgment. *Zoeller v. Augustine*, 271 Ill. App. 3d 370, 374, 648 N.E.2d 939 (1995) (*Zoeller*). Summary judgment "shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2—1005 (West 2000). Summary judgment is a "drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free

from doubt." *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986). The court must award summary judgment with caution to avoid preempting a litigant's right to trial by jury or his right to present fully the factual basis of a case where a material dispute may exist. *Lamkin v. Towner*, 246 Ill. App. 3d 201, 204, 615 N.E.2d 1208 (1993). In determining a summary judgment motion, the court must construe the pleadings, affidavits, depositions and admissions on file strictly against the moving party and liberally in favor of the opponent. *In re Estate of Hoover*, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736 (1993). Reversal of a summary judgment motion is warranted if, on review of the case, a material issue of fact or an inaccurate interpretation of the law exists. *Zoeller*, 271 Ill. App. 3d at 374.

■ The standard of review of a motion to dismiss under section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 2000)) is *de novo*. *Neppl v. Murphy*, 316 Ill. App. 3d 581, 584, 736 N.E.2d 1174 (2000) (*Neppl*). A section 2—619 motion admits the legal sufficiency of the complaint and raises defects, defenses or other affirmative matter that appears on the face of the complaint or is established by external submissions which act to defeat plaintiff's claim. *Neppl*, 316 Ill. App. 3d at 584. If a cause of action is dismissed pursuant to section 2—619, the question on appeal is whether a genuine issue of material fact exists and whether defendant is entitled to a judgment as a matter of law. *McGee v. State Farm Fire & Casualty Co.*, 315 Ill. App. 3d 673, 680, 734 N.E.2d 144 (2000).

I

SOE asserts that the circuit court erred in finding that it lacked standing to prosecute its claims for damages because the damages it seeks to recover were those sustained by its creditors, and erred in finding that SOE did not suffer damages as a matter of law because the only measure of SOE's recovery was the amount actually spent by it to repair the automobiles rather than the amounts listed on the insurance certificates.

A

SOE maintains that it has standing to prosecute claims for its damages. Specifically, SOE challenges the circuit court's application of the findings in *Holland v. Arthur Andersen & Co.*, 212 Ill. App. 3d 645, 571 N.E.2d 777 (1991) (*Holland II*), to the instant case and relies upon *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492, 524 N.E.2d 561 (1988) (*Greer*). In *Greer* the court held that the claimed injury need only be (1) "distinct and palpable"; (2) "fairly traceable" to defendant's actions; and (3) "substantially likely to be prevented or redressed by the grant of the requested relief." *Greer*, 122 Ill. 2d at 492-93.

■ The party seeking to invoke the jurisdiction of the court must have some real interest in the cause of action, however, or a legal or equitable right, title or interest in the subject matter of the controversy. *Unger v. Nunda Township Rural Fire Protection District*, 135 Ill. App. 3d 758, 763, 482 N.E.2d 123 (1985). This principle is exemplified in *Holland II*, where plaintiff, a trustee in bankruptcy for the estate of American Reserve Corporation (ARC), appealed from a summary judgment order entered in favor of defendant, contending that a genuine issue of material fact remained as to the existence of damages sustained by ARC. In *Holland II*, plaintiff alleged that it was damaged by misleading financial statements and unqualified opinions issued by defendant about ARC's financial condition. Defendant argued that plaintiff's proposed claims belonged to third-party creditors and shareholders, for which plaintiff lacked standing to sue. The *Holland II* court found that plaintiff could not pursue the creditors' claims because they were personal to the creditors. The court held that summary judgment was appropriate since plaintiff failed to identify any other damage to ARC. *Holland II*, 212 Ill. App. 3d at 651.

Defendants in *Scholes v. Stone, McGuire & Benjamin*, 821 F. Supp. 533 (N.D. Ill. 1993) (*Scholes*), upon which SOE relies, similarly argued that summary judgment was proper where the damages alleged by a receiver were those suffered by investors and not by the entities in the receivership. There, plaintiff was appointed to represent the receivership entities established by Michael Douglas in furtherance of what was a continuing scheme to lure investors into investing their money in what were supposed to be legitimate limited partnerships. Douglas, through a series of lies and concealment, successfully induced investors to invest large sums into these entities. Eventually, the Securities and Exchange Commission (SEC) shut down all of Douglas's operations, but only after the public had invested over $30 million in the receivership entities. Defendants consisted of attorneys and a law firm that performed substantial legal work for Douglas and the receivership entities. Plaintiff alleged that this legal work substantially furthered the fraud and misappropriation that gave rise to the initial SEC action.

The *Scholes* court determined whether the receiver had alleged damages suffered by the receivership entities as distinct from damages suffered by the individual investors, finding that the parties intended to form and invest in the limited partnerships and that Douglas's subsequent fraud did not negate the existence of the entities. According to the court, "any wrongful actions of the defendants resulting in the loss of funds invested in the Receivership Entities damaged the entities to the extent the loss is attributable to the wrongful acts.

Merely because the losses alleged include funds contributed by the investors does not negate this fact." *Scholes*, 821 F. Supp. at 537.

The *Scholes* decision does not aid SOE. There, the court determined the issue of whether dissipation of funds contributed for partnership interests damaged the partnership entities or the investors in those entities. The *Scholes* court noted that "[i]f the funds deposited by investors into the Receivership Entities became funds belonging to the entities, then a claim of legal malpractice or breach of fiduciary duty resulting in the loss of those funds would sufficiently allege damage to the entities"; however, "if the funds never actually belonged to the entities or the entities were never otherwise entitled to these funds, the entities could not have been damaged by their wrongful dissipation." *Scholes*, 821 F. Supp. at 536.

■ Here, unlike the receivership entities in *Scholes*, there is no record evidence to show that funds wired from Runo to SOE actually belonged to SOE or that SOE was entitled to these funds, other than the $365,000 that it kept as profit after the cars were shipped. Because no "wrongful dissipation" of SOE's funds occurred, as SOE solely relied on Runo to finance and "invest" in the export project, SOE cannot claim damages.

The findings in *Holland II* are applicable to this case. Although SOE did not assert that the only damages suffered were those of the creditors, the record establishes that the damages SOE is seeking are identical to the bankruptcy claim filed by Objective, as Runo's assignee. The only damages for which SOE has provided evidence are those claims that personally belong to the creditor. The circuit court specifically noted that SOE was given every opportunity to discover legally cognizable damages; however, SOE has shown nothing to support the claimed damages essential to its case.

The circuit court properly determined that SOE lacks standing to bring this action for claims which in fact belong to a third-party creditor. Accordingly, the court's September 8, 2000, grant of Intercargo's motion for summary judgment and Abaco's motion to dismiss must be affirmed.[1]

---

[1]SOE also argues that a bailment existed between Runo and SOE. A bailment is defined as " 'the delivery of goods for some purpose, upon a contract, express or implied, that after the purpose has been fulfilled they shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept [until] he reclaims them.' [Citation.]" *Kirby v. Chicago City Bank & Trust Co.*, 82 Ill. App. 3d 1113, 1116, 403 N.E.2d 720 (1980) (*Kirby*). The elements necessary for a bailment include (1) "an agreement by the bailor to transfer or deliver and the bailee to accept exclusive possession of goods for a

## B

Assuming, *arguendo*, that SOE possessed the requisite standing to pursue its putative claim, nevertheless, it could not prove cognizable damages to its interests. In its findings, the circuit court stated that it did not believe that a "jury could possibly find that [SOE] is entitled to any money," and that "even if there was a decision made by the jury or a fact finder as to some moneys that might be due to [SOE]," a remittitur would be requested because out-of-pocket expenses were absent.

■ In construing the meaning of an insurance contract, a reviewing court must consider the fundamental purpose of the insurance coverage. *Paluszek v. Safeco Insurance Co. of America*, 164 Ill. App. 3d 511, 516, 517 N.E.2d 565 (1987) (*Paluszek*). The proceeds of an insurance contract are indemnity for actual loss sustained by the insured (*Paluszek*, 164 Ill. App. 3d at 516) or loss payee.[2] Unless and until an actual loss is sustained and proved, he or she is not entitled to reimbursement. *Paluszek*, 164 Ill. App. 3d at 516.

■ Further, the *Paluszek* court stated that "[p]roperty insurance is not insurance on the property itself, but rather on the interest of the person insured. *Insurance coverage does not run with the property when transferred.*" (Emphasis added.) 164 Ill. App. 3d at 516. An

---

specified purpose"; (2) "the actual delivery or transfer of exclusive possession of the property of the bailor to the bailee"; and (3) "acceptance of exclusive possession by the bailee." *Kirby*, 82 Ill. App. 3d at 1116.

In the present case, the record does not support SOE's theory that it was in physical possession of the vehicles at the time of loss. Further, there was never a transfer of possession of the cars from Runo, the alleged bailor, to SOE, the claimed bailee. SOE's bailment argument must be rejected.

[2]SOE points out that it is listed as the loss payee rather than the insured or assured on the insurance certificates, thereby bearing the risk of loss as holder of the certificate. This court previously has noted that " '[t]he party designated [as the loss payee] is merely an appointee to receive the sum which might be recovered by the insured in case of loss, *to the extent of the appointee's interest therein*. The payee has no direct rights against the insurer, but recovers, if at all, solely in the right of the insured, and only when the latter has a valid and enforceable demand under the policy.' " (Emphasis added.) *Posner v. Fireman's Insurance Co.*, 49 Ill. App. 2d 209, 216, 199 N.E.2d 44 (1964), quoting *Barick v. Westchester Fire Insurance Co. of New York*, 266 Ill. App. 574, 577 (1932).

Here, SOE has provided no proof that it maintained a right of recovery. SOE cannot enforce the insurance certificates to its own benefit because, as previously noted, it has retained no insurable interest in the damaged automobiles.

insurance contract is one that pays an amount of money equal to the loss the insured party has suffered. Consistent with this principle, the court held that defendant was not obligated to reimburse plaintiff for repairs to the dwelling performed and paid for by another party, that defendant does not insure the subsequent owner and, therefore, cannot reimburse plaintiff for pecuniary loss suffered by the subsequent owner. *Paluszek*, 164 Ill. App. 3d at 517.

■ Based upon facts relating to the sale of the cars from SOE to Runo, paid for with Runo's money, it is clear that SOE had no insurable interest in the cars at the time of loss. The transaction underlying these insurance claims was a sale of goods, namely, automobiles, pursuant to the Illinois Uniform Commercial Code (UCC) (810 ILCS 5/2—101 *et seq.* (West 2000)). Title or a security interest are the two prerequisites to a seller's insurable interest in goods which are the subject of a UCC sales transaction. See 810 ILCS 5/2—501(2) (West 2000) (section 2—501(2)). The UCC provides that "[t]he seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him." 810 ILCS 5/2—501(2) (West 2000). The UCC specifies when title passes from seller to buyer, which depends on the terms and circumstances of the underlying sale.

The terms of SOE's sale of the cars to Runo are relevant to these proceedings. Vilner, SOE's president, admitted that the sale of the cars to Runo was based upon CIF terms. The facts and circumstances of the sale further demonstrate a consummated CIF sale because the purchase price was prepaid fully by Runo to SOE, including the cost of insurance and freight to destination. See 810 ILCS 5/2—320 (West 2000) (section 2—320). As a matter of law, title passed to Runo upon SOE's tender of possession of the cars to a carrier for transportation and, thereafter, it was Runo, not SOE, which had an insurable interest in the vehicles. See 810 ILCS Ann. 5/2—320, Uniform Commercial Code Comment, at 254 (Smith-Hurd 1993) ("[d]elivery to the carrier is delivery to the buyer for purposes of risk and 'title' "). This transaction was not executory. There is no support in the record for SOE's claim that it had retained a security interest.

The case of *Tupman Thurlow Co. v. Cook*, 342 Ill. App. 344, 96 N.E.2d 666 (1950) (*Cook*), also supports the conclusion that the sales transaction in this case was a consummated sale on CIF terms. There, the issue was whether a particular transaction qualified as a CIF sale. The parties agreed that while the contract of sale for the goods included the cost of the merchandise, insurance and freight charges to destination, it was not strictly a CIF transaction because the seller was required to pay duty on the buyer's behalf. The buyer argued that title had not shifted to him from the seller upon the seller's tender of

the goods to the carrier because this additional term transformed the contract to one on other than strictly CIF terms. *Cook*, 342 Ill. App. at 349. The court stated "[b]ecause the contract was not C.I.F. it does not follow that title did not pass when the merchandise was put on board at Wellington." *Cook*, 342 Ill. App. at 350. The court held that under the then "Uniform Sales Act" (Ill. Rev. Stat. 1949, ch. 121½, par. 19), where goods are appropriated unconditionally to the contract of sale in a deliverable state by the seller with the buyer's consent, title passes to the buyer. *Cook*, 342 Ill. App. at 350-51. The court further noted that all of the indicia of the contract favored this result. *Cook*, 342 Ill. App. at 351.

Assuming, *arguendo*, that SOE somehow can claim ownership of the vehicles during shipments, the record shows that ownership transferred upon arrival of the goods in Russia. The only way Runo, Leks and Kristall could accept the goods upon their arrival was by demonstrating their right to possession to Russian customs agents, which the record shows occurred through the presentation of sales invoices and insurance certificates.[3] The record establishes that Runo paid for the repairs to the damaged cars. SOE seeks to collect for

---

[3] Although SOE claims that Runo's use of the cars after delivery in Russia should not be considered acceptance of nonconforming goods under section 2—510 (810 ILCS 5/2—510 (West 2000)) of the UCC, arguing that Runo never accepted the cars, the law provides otherwise. Section 2—606 (810 ILCS 5/2—606 (West 2000)) sets forth the criteria for determining when a buyer has accepted goods as follows:

"(1) Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2—602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him." 810 ILCS 5/2—606 (West 2000).

Acceptance of goods is complete, then, when a buyer, after a reasonable time to inspect the goods, signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity or does any act inconsistent with the seller's ownership of the goods. 810 ILCS 5/2—606 (West 2000). Any act performed by the buyer of goods tendered in fulfillment of a contract of sale, which he would have no right to do if he were not the owner, itself constitutes an acceptance of the goods. *Fred W. Wolf Co. v. Monarch Refrigerating Co.*, 252 Ill. 491, 502, 96 N.E. 1063 (1911); *Foley & Co. v. Excelsior Stove & Manufacturing Co.*, 265 Ill. App. 78, 94 (1932). Further,

repairs that it neither made nor paid for. Possession of the insured property at issue here was transferred and, therefore, coverage does not run with that property. Accordingly, the circuit court did not err in finding that SOE had not sustained a compensable loss.

### C

SOE argues that the clear language of the insurance certificates mandates a finding that prior to the loss, the parties agreed to the amounts due in case of loss and, therefore, SOE is entitled to recover as a matter of law.

■ The primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073 (1993) (*Crum & Forster*). If the terms of the policy are clear and unambiguous, they must be given their plain and ordinary meaning. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204 (1992) (*Outboard Marine*). Conversely, if the terms of the policy are susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy. *Outboard Marine*, 154 Ill. 2d at 108-09. In addition, provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer. *National Union Fire Insurance Co. of Pittsburgh, Pennsylvania v. Glenview Park District*, 158 Ill. 2d 116, 122, 632 N.E.2d 1039 (1994). The policy must be construed as a whole, taking into account the type of insurance purchased, the nature of the risks involved and the overall purpose of the contract. *Crum & Forster*, 156 Ill. 2d at 391. The construction of an insurance policy is a question of law subject to *de novo* review. *Oakley Transport, Inc. v. Zurich Insurance Co.*, 271 Ill. App. 3d 716, 720, 648 N.E.2d 1099 (1995).

■ SOE contends that, because the insurance certificates include the term "valued at sum insured," the insurance contract here is a "valued contract," which stipulates the amount of damages in advance, thereby making the actual value of the loss irrelevant. The authorities upon which SOE relies, however, both state that for valued

---

repairing, correcting and altering a purchased unit which is deemed "satisfactory" by the buyer is an indication of acceptance. *Brule C. E. & E., Inc. v. Pronto Foods Corp.*, 3 Ill. App. 3d 135, 139, 278 N.E.2d 477 (1971); *Factofrance Heller v. I.P.M. Precision Machinery Co.*, 627 F. Supp. 1412, 1415 (N.D. Ill. 1986); *Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F. Supp. 432, 433 (1983). Under the facts of the case *sub judice*, Runo accepted the automobiles.

policies to apply, a "total loss of the insured property" must occur. *Clark v. Aetna Casualty & Surety Co.*, 778 F.2d 242, 247 (5th Cir. 1985); *Polytech, Inc. v. Affiliated FM Insurance Co.*, 21 F.3d 271, 273 (8th Cir. 1994). In the present case, there was no total loss of the insured property. Therefore, SOE's valued contract argument must be rejected.

■ SOE cites other authority to support its contention that it had no requirement to prove any damages: *Perzy v. Intercargo Corp.*, 827 F. Supp. 1365 (N.D. Ill. 1993); *Aguilera v. Pacillo Insurance Co.*, No. 95 C 1163 (N.D. Ill. January 11, 1996) (*Aguilera*); *Edlin v. Security Insurance Co.*, 269 F.2d 159 (7th Cir. 1959); and *First National Bank of Highland Park v. Boston Insurance Co.*, 17 Ill. 2d 147, 160 N.E.2d 802 (1959). All the above-cited cases are distinguishable since none of them involved the specific factual occurrence here, namely, that after discovering damage to the goods shipped, Runo accepted the goods and repaired the damage, not SOE.

The face of the insurance policy states that "in case of loss, the same is payable to the order of [SOE]." All property insurance contracts, including marine contracts, are considered "contracts of indemnity, intended solely to indemnify the insured for his *actual monetary loss* by the occurrence of the disaster. Unless the insured has sustained an actual loss, the insurer has no liability." (Emphasis added.) 4 J. Appleman & J. Appleman, Insurance Law & Practice § 2107 (rev. 1969). SOE did not pay for repairs using its own funds. The policy in favor of coverage does not apply here because the putative insured, SOE, was not deprived of a benefit for which it paid. *Dash Messenger Service, Inc. v. Hartford Insurance Co. of Illinois*, 221 Ill. App. 3d 1007, 1010, 582 N.E.2d 1257 (1991).

The language of the insurance certificates does not support a finding that, prior to the loss, the parties agreed to the amounts due in case of loss. The circuit court's conclusion that SOE is not entitled to recover as a matter of law must be affirmed.

Considering the foregoing result, SOE's negligence claim against Abaco need not be analyzed.

## II

■ SOE next contends that a question of material fact exists with respect to whether it sustained compensable damages. SOE insists that there is ample evidence proving the amount of damages it suffered, pointing to record evidence of photographs, witness testimony, insurance surveys, answers to interrogatories and the bankruptcy claim.

SOE did not provide case law in support of these contentions, in

contravention of Supreme Court Rule 341(e)(7). 177 Ill. 2d R. 341(e)(7). Bare contentions without argument or citation of authority do not merit consideration on appeal. See *Fuller v. Justice*, 117 Ill. App. 3d 933, 942-43, 453 N.E.2d 1133 (1983). Therefore, this argument is waived. See *Nancy's Home of the Stuffed Pizza, Inc. v. Cirrincione*, 144 Ill. App. 3d 934, 939, 494 N.E.2d 795 (1986).

Notwithstanding waiver, the parties do not dispute that the cars were damaged during shipment. There is a difference, however, between claiming that a loss occurred and proving a loss to the claimant. SOE claims that it suffered the damages but the record does not show a connection between SOE and the damages sustained. Instead, the evidence shows that Runo suffered the actual loss. Again, as discussed earlier, the record contains no evidence of SOE paying for anything using its own funds. Further, SOE benefitted from the project by receiving payment in the amount of $365,000 for its services.

SOE also claims that the circuit court, in its September 10, 1999, and September 7, 2000, findings, stated that a question of fact remained over the value of the claim, referring to $50,000 that SOE paid for shipment of automobile parts for the repairs. In viewing the context of the report of proceedings, however, the court only asked about the existence of the $50,000 claim; it did not find that a question of material fact existed with respect to whether SOE sustained compensable damages.

Based on the foregoing, SOE has not shown the existence of a material fact with respect to whether SOE sustained compensable damages and the circuit court must be affirmed on this issue as well.

### III

SOE next asserts that the circuit court erred by reconsidering Intercargo's motion for summary judgment and vacating its prior order denying the motion, because the court violated Cook County Rule 2.1(f) (Cook Co. Ct. R. 2.1(f) (eff. June 15, 1988)) (Rule 2.1(f)) in deciding Intercargo's motion one day before trial. Rule 2.1(f) states that "[a]ll motions for summary judgment shall be filed and noticed for hearing not later than forty-five (45) days before the trial date, except by prior leave of court and for good cause shown." Cook Co. Ct. R. 2.1(f) (eff. June 15, 1988).

SOE raises this contention for the first time on appeal. Failure to raise this issue below in the original proceedings constitutes a waiver of the right to raise it for the first time on appeal. *E&E Hauling, Inc. v. Pollution Control Board*, 107 Ill. 2d 33, 38, 481 N.E.2d 664 (1985); *McLean v. Department of Revenue*, 326 Ill. App. 3d 667, 674, 761 N.E.2d 226 (2001). SOE has waived review of this issue.

## IV

SOE next contends that the circuit court erred in granting certain motions *in limine* regarding repairs to the damaged vehicles. In light of the dispositions under the preceding points I through III, this contention need not be addressed, since SOE has not shown its entitlement to recover damages in any amount.

## V

On cross-appeal, in an argument closely related to Part II of this opinion, Intercargo maintains that SOE had no insurable interest in the goods under the insurance certificates once transit commenced. In support of its contention, Intercargo notes that Runo prepaid all the expenses involved in the export project, Runo was listed as the consignee on all the bills of lading and commercial invoices and Vilner testified that the transaction was on a CIF basis. Intercargo asserts that because the transaction falls under the UCC, SOE would have had to possess title to or a security interest in the goods at the time of loss.

█ As previously noted, a person has an insurable interest in property when he owns " 'any interest in the property cognizable in law or equity [or] is the owner of equitable title.' " *Aguilera*, slip op. at 2, quoting *Milan v. Providence Washington Insurance Co.*, 227 F. Supp. 251, 254 (E.D. La. 1964).

Section 2—501(2) of the UCC provides, "[t]he seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him." 810 ILCS 5/2—501(2) (West 2000). Section 2—320 of the UCC states that CIF means that "the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination."[4] 810 ILCS 5/2—320 (West 2000).

█ Here, the cars were identified in the contract of sale by SOE with Runo's consent, with all costs associated with the purchase and transportation having been prepaid to SOE by Runo. The contract was based on CIF terms; title passed to Runo once the vehicles commenced

---

[4]Section 2—320 also provides:

"Unless otherwise agreed and even though used only in connection with the stated price and destination, the term C.I.F. destination or its equivalent requires the seller at his own expense and risk to

\* \* \*

(c) obtain a policy or certificate of insurance \*\*\* shown to cover the same goods covered by the bill of lading and providing for payment of loss to the order of the buyer or for the account of whom it may concern \*\*\*." 810 ILCS 5/2—320(2)(c) (West 2000).

their transit. Thereafter, SOE had no insurable interest at the time of loss, either as an insured or as a loss payee.

SOE's contention, that its obligation was to deliver the vehicles to Russia undamaged, does not change the fact that title to the vehicles passed as a matter of law when they were tendered to the first carrier for transportation. Further, SOE's claim against Intercargo is a first party claim for property damage insurance, not a liability claim. The fact that SOE may believe it has potential liability to Runo for the cars, or that Objective has made a claim against SOE in bankruptcy, does not establish an insurable interest under the policy at issue. There is a clear distinction between contracts to indemnify against liability incurred and those to indemnify against loss. See *Ohio Farmers Insurance Co. v. Lanta*, 246 F.2d 1182, 1185 (7th Cir. 1957); *Daugherty v. Alliance Casualty Co.*, 271 Ill. App. 71, 80 (1933) (*Daughtery*). Policies insuring against loss as opposed to indemnity require proof of an actual loss. *Kinnan v. Charles B. Hurst Co.*, 317 Ill. 251, 255, 148 N.E. 12 (1925); *Daughtery*, 271 Ill. App. at 80; 5 Couch Cyclopedia of Insurance Law § 1165, at 4085 (1929). SOE could have insured its potential commercial liability for breach of contract under an appropriate policy; it had an insurable interest in its own contracts to do so. That interest, however, is insufficient in the context of insuring its own actual loss for physical loss or damage to goods where, as here, they belonged to a different entity.

The circuit court improperly found that SOE possessed an insurable interest in the vehicles, which finding must be reversed.

In view of this disposition, other issues raised in the counterappeal require no further consideration.

A trustee in bankruptcy can bring only those claims that belong to the entity it represents and cannot pursue third-party claims. See *Scholes*, 821 F. Supp. at 535-36. Since SOE's complaint sought damages for repairs to property it neither owned nor in which it had an insurable interest, the circuit court properly granted Intercargo's summary judgment motion and Abaco's motion to dismiss.

For the above-stated reasons, the judgment of the circuit court of Cook County is affirmed on SOE's principal appeal and reversed on Intercargo's crossappeal.

Affirmed in part and reversed in part.

THEIS, P.J., and KARNEZIS, J., concur.