# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Borsellino v. Putnam*, 2011 IL App (1st) 102242

---

| | |
|---|---|
| Appellate Court Caption | LEWIS J. BORSELLINO, Plaintiff-Appellee and Cross-Appellant, v. GERALD D. PUTNAM, MARRGWEN TOWNSEND, and STUART TOWNSEND, Defendants-Appellants and Cross-Appellees. |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-10-2242, 1-10-2246 cons. |
| Filed | December 2, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a judgment entered for plaintiff in an action alleging fraud in the settlement of an earlier claim against plaintiff's former partners in the formation and operation of a stock trading business, the appellate court held that plaintiff had standing to bring the fraud action, but the settlement agreement and release of plaintiff's earlier claim barred the fraud action and required reversal of the judgment for plaintiff where plaintiff retained payment made under the settlement and did not attempt to rescind the release. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 00-CH-13958, 04-L-3326 cons.; the Hon. Ronald F. Bartkowicz, Judge, presiding. |
| Judgment | Reversed. |

| Counsel on Appeal | Michael A. Pollard, William Lynch Schaller, John M. Murphy, and Peter P. Tomczak, all of Baker & McKenzie LLP, of Chicago, for appellants. |
| --- | --- |
| | Jon Loevy, Michael Kanovitz, and Aaron Mandel, all of Loevy & Loevy, of Chicago, and Michael T. Reagan, of Law Offices of Michael T. Reagan, of Ottawa, for appellee. |
| Panel | PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Justices Cahill and Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1    These consolidated appeals arise from a dispute concerning the effect of a settlement reached in an earlier lawsuit between the same parties involved in the instant appeals. The parties were business associates whose companies were members of Chicago Trading & Arbitrage, L.L.C. (CTA[1]), an Illinois limited liability company. In 1998, plaintiff Lewis Borsellino's company filed a derivative suit on behalf of CTA, claiming that defendants Gerald Putnam, Marrgwen Townsend, and Stuart Townsend and their respective companies had used CTA's resources for the benefit of competing companies owned by Putnam and the Townsends and that they concealed CTA's financial records, which would have disclosed this information.

¶ 2    In 1998, the parties settled the claim, entering into a settlement agreement in which $250,000 was paid in exchange for releasing any claims against the defendants or their companies. Borsellino later filed two lawsuits against the current defendants alleging fraud; the actions were eventually consolidated. After a trial, the jury found in Borsellino's favor against all three defendants and the trial court entered judgment in the amount of $10.78 million. The trial court initially awarded Borsellino prejudgment interest, but later granted defendants' posttrial motion in part and vacated the award of prejudgment interest. Both parties filed posttrial motions but, other than the portion of defendants' motion concerning prejudgment interest, both motions were denied.

¶ 3    Defendants appeal, requesting reversal of the trial court's judgment for four reasons: (1) Borsellino lacked standing, (2) the claim is barred by the release and the judgment in the 1998 lawsuit, (3) the cause of action under which Borsellino recovered is not recognized under Illinois law, and (4) Borsellino failed to establish that defendants owed him fiduciary

---

[1]The abbreviation "CTA" for Chicago Trading & Arbitrage, L.L.C., has been used by the parties and the trial court throughout this litigation. We will use the same abbreviation for the sake of consistency.

duties and that he reasonably relied on their representations. Defendants also argue that the amount of damages awarded Borsellino was not legally available to him and request that the amount of the judgment be reduced if not reversed. In his cross-appeal, Borsellino requests a new trial on the issue of punitive damages, which the trial court refused to allow to be presented to the jury, and asks for the trial court's award of prejudgment interest to be reinstated. In the event that Borsellino prevails on his cross-appeal, defendants also request a new trial based on four rulings made by the trial court: (1) the jury instruction on burden of proof, (2) two evidentiary rulings, and (3) the trial court's limitation on defendants' cross-examination of Borsellino. We reverse.

## BACKGROUND

### I. Parties

Plaintiff Lewis Borsellino was a member of the Chicago Mercantile Exchange and a trader of stock futures. At trial, Borsellino testified that he was a trader at the Chicago Mercantile Exchange from 1981 through 2002 and at the time of the formation and operation of CTA, was approximately 35 years old and had been a trader for 15 years. Borsellino was the owner of I.M. Acquisitions, L.L.C. (IMA), an Illinois limited liability company. The offices of IMA were in the same location as the offices of CTA.

Defendant Gerald Putnam was the majority shareholder of GDP, Inc. (GDP), an Illinois corporation. Putnam was also the owner of Terra Nova Trading, L.L.C. (Terra Nova), an Illinois limited liability company that operated as a broker-dealer,[2] specializing in options trading or derivative trading. The offices of Terra Nova were in the same location as the offices of CTA. We refer to Putnam, GDP, and Terra Nova as the "Putnam-related defendants."

Defendants Marrgwen and Stuart Townsend[3] were members of Virago Enterprises, L.L.C. (Virago), an Illinois limited liability company. The Townsends were also owners of Townsend Analytics, Ltd. (TAL), a software development company organized as an Illinois corporation. Stuart Townsend testified that the "core business" of TAL was financial software and computer display software, including a program called RealTick. We refer to the Townsends, Virago, and TAL as the "Townsend-related defendants."

### II. Formation of CTA

According to Putnam's trial testimony, in October 1995, Putnam and the Townsends

---

[2]According to Borsellino's trial testimony, a broker-dealer license "allows you to collect commission dollars from the execution of stocks." Putnam testified that he was required to pass several examinations showing that he had the qualifications to be a principal in a broker-dealer business.

[3]We refer to Marrgwen and Stuart Townsend collectively as "the Townsends."

discussed the creating of a small order execution system (SOES) electronic trading room.[4] Putnam testified that he spoke to Borsellino about establishing a SOES trading room in Chicago, and Borsellino was interested.

¶ 11    The 1998 complaint alleges that Putnam, Borsellino, and the Townsends agreed to form CTA, which would operate a SOES room located in Chicago. The Townsends had already been involved in the technological side of trading, having developed the RealTick software that displayed information about NASDAQ prices to SOES traders around the country. Putnam had a broker-dealer license through Terra Nova, which was required in order to operate the SOES room, and would run the daily operations of the business. Borsellino testified that he provided the business with capital as well as a "name," since he was well-known in the trading community.

¶ 12    Borsellino testified that he, the Townsends, and Putnam went into business as individuals, but "kind of turned it over" to CTA's attorney to " 'come up with the best corporate structure.' " The attorney organized CTA as a limited liability company in December 1996 and IMA, GDP, and Virago, the companies of Borsellino, Putnam, and the Townsends, respectively, were made the members. The 1998 complaint alleged that Putnam, Borsellino, and the Townsends agreed that the three companies would share profits and liabilities equally and that each would contribute an equal amount of capital to the formation of CTA. All commissions for trades were to proceed through Terra Nova, which was a licensed broker-dealer. CTA became operational as a SOES room in February 1996 and began electronic trading.

¶ 13                                    III. Archipelago

¶ 14    Shortly thereafter, Putnam testified that he became aware of new Securities and Exchange Commission (SEC) "order handling rules" that were "designed *** to make NASDAQ's marketplace a fairer place." After examining the rules, Putnam noticed an "opportunity" to establish his own electronic communication network (ECN).[5] Putnam testified that he approached the Townsends and explained his idea, asking them whether they would be able to design the software to establish the business. Putnam testified that he and the Townsends conceived of forming a company that they called Archipelago to run the ECN. Stuart Townsend testified that they began working on the software for Archipelago in October 1996. A printout from Archipelago's website that was attached to the 1998 complaint stated that "Archipelago is a joint venture by Townsend Analytics Ltd. and Terra Nova Trading that will run an ECN for NASDAQ stocks. TAL is supplying the ECN software. Terra Nova is providing broker dealer services."

---

[4]According to IMA's 2000 complaint, SOES trading "allowed small or individual investors direct access to the NASDAQ national market, and its constituency of market makers, via computer software and network equipment."

[5]Putnam explained that "[t]he easiest way to understand what [an ECN] is is it looks exactly like a stock exchange except it has a different regulatory status than the stock exchange does."

¶ 15    Stuart Townsend testified that Archipelago launched on January 20, 1997, and within approximately two months, was trading all of the same stocks as NASDAQ. Putnam testified that Archipelago became the first fully electronic stock exchange in the United States. In 2004, the company went public and became the first United States stock exchange to be a public company. The company eventually merged with the New York Stock Exchange, where Putnam served as president.

¶ 16                                    IV. 1998 Suit[6]

¶ 17    In 1998, IMA filed a derivative suit on behalf of CTA against the Putnam-related defendants, the Townsend-related defendants, and Archipelago. The complaint contained three counts. Count I was for derivative relief and sought an accounting and return of any proceeds wrongfully withheld from CTA. Count II was entitled "Imposition of Constructive Trust" and sought the imposition of a constructive trust and an accounting. Count III was a separate action in law for breach of fiduciary duty and sought monetary damages in excess of $100,000. The complaint alleged that Marrgwen Townsend and Putnam falsely stated that CTA's resources and the contributions of the Townsends, Putnam, and Borsellino would be exclusively used for the use, benefit, or ownership of CTA. The complaint further alleged that, in fact, Marrgwen Townsend and Putnam actively utilized CTA's resources for their personal gain and for the creation of businesses competing against CTA, including Terra Nova and Archipelago.

¶ 18    The complaint also alleged that Marrgwen Townsend and Putnam concealed facts from Borsellino, including that they created businesses that would directly compete with CTA and that they were using CTA's resources for the benefit of these businesses. Finally, the complaint alleged that the 1998 defendants had marketed Archipelago and developed business relationships with clients that should have been offered to CTA and that software developed by the Townsends that permitted the establishment of remote SOES rooms should have belonged to CTA.

¶ 19    Shortly after it was filed,[7] the parties settled the lawsuit, executing a confidential "Settlement Agreement and Mutual Release" (the settlement agreement or the release) that read in relevant part:

> "1. **I. M. ACQUISITIONS, L.L.C.,** an Illinois limited liability company ('I.M.'), and **LEWIS J. BORSELLINO** ('LJB') and **CHICAGO TRADING & ARBITRAGE, L.L.C.,** an Illinois limited liability company ('CTA'), for good and valuable consideration, \*\*\* hereby forever release and discharge **VIRAGO ENTERPRISES,**

---

[6]There are several lawsuits relevant to these appeals. Where necessary, we clarify the lawsuit and parties at issue by including the year of the suit. For instance, the lawsuit filed in 1998 is the "1998 suit," and the defendants are the "1998 defendants." All of the lawsuits were filed by Borsellino and/or IMA, so we use either the plaintiff's name or "plaintiffs" when referring to both throughout.

[7]The executed settlement agreement is not dated.

**L.L.C., *** MARRGWEN TOWNSEND,** individually ***, **STUART TOWNSEND,** individually ***, and **TOWNSEND ANALYTICS, LTD., *** ARCHIPELAGO, L.L.C., *** GDP, INC., *** TERRA NOVA TRADING L.L.C., *** and GERALD D. PUTNAM ***,** and their employees, officers, directors, members, parents, successors, affiliates, assigns, heirs and legatees from all claims, demands, damages, suits, judgments, debts, obligations, actions or causes of action, settlements and demands of any nature, whether sounding in contract or in tort, whether based on statute, common law, rule or regulations, whether in law or in equity, whether direct or consequential, compensatory or exemplary, liquidated or unliquidated, known or unknown, which either party hereto now has or ever had or which its respective successors or assigns hereafter shall or may have, on or at any time prior to the date of this Settlement Agreement and Mutual Release including those claims asserted in the Verified Complaint for Derivative and Other Relief, filed in the Circuit Court of Cook County, Illinois, and entitled, I.M. Acquisitions, L.L.C. v. Chicago Trading & Arbitrage, Case No. 98 CH 1363 ***."

The settlement agreement provided that IMA would dismiss the derivative suit and that consideration included a payment of $250,000. The settlement agreement further stated that pursuant to a separate agreement to be executed at the same time as the settlement agreement, IMA would assign its interest in CTA to Virago and GDP. Borsellino signed the settlement agreement both on behalf of IMA and on his own behalf.

¶ 20    The parties entered into a stipulation that the action be dismissed with prejudice, which was filed on March 4, 1998. On the same day, the trial court entered the following agreed order of dismissal:

"THIS MATTER COMING BEFORE THE COURT on the parties' Agreed Motion to Dismiss; the parties having reached a[n] agreement and having entered into a Settlement Agreement and Mutual Release; the Court having been duly advised in the premises;

IT IS HEREBY ORDERED THAT:

This matter is dismissed with prejudice, with each party to bear its own costs."

¶ 21                                              V. 2000 Suit

¶ 22    On September 25, 2000, Borsellino and IMA filed suit against the Putnam-related defendants, the Townsend-related defendants, Archipelago, and several other companies and individuals not relevant to the instant appeals.[8] The verified complaint contained six counts: (1) rescission of the settlement agreement, (2) fraud, (3) breach of fiduciary duty, (4) constructive trust, (5) accounting, and (6) declaratory judgment. The complaint alleged that after the 1998 derivative suit, Putnam and Marrgwen Townsend offered to pay Borsellino

---

[8] The other parties were eventually voluntarily dismissed from the action.

$250,000 for his one-third ownership in CTA.[9] Shortly after the transaction, Borsellino learned that Putnam and Marrgwen Townsend sold assets of the business to third parties for approximately $75 million. Borsellino alleged that Putnam and Marrgwen Townsend never disclosed the value of the assets or that they were intending to sell them and had they done so, Borsellino would not have agreed to sell his interest for $250,000. Borsellino sought to rescind the parties' settlement agreement as well as compensatory and punitive damages, each in excess of $25 million.

¶ 23        The 2000 complaint expanded on the allegations of the 1998 complaint, including the establishment of remote SOES rooms that routed their trades to CTA, which the complaint alleged would not have been possible without the use of a routing system developed for the use and benefit of CTA. The complaint further alleged that while refusing to provide Borsellino with financial records, Putnam represented to Borsellino that CTA was not making any money.

¶ 24        The complaint also alleged that Borsellino became aware of more details concerning the establishment of Archipelago. He learned that Putnam and Marrgwen Townsend had applied for the right to own and operate an ECN, which was a conflict of interest for a trading firm such as CTA. Borsellino alleged that when Putnam and Marrgwen Townsend finally provided him with financial documents, they stated that the original business of CTA had concluded and failed to mention Archipelago. Borsellino specifically requested information about Archipelago, including its value, but that information was not provided. Finally, Borsellino alleged that while he was negotiating the settlement of the 1998 suit, Putnam and Marrgwen Townsend were actively engaged in preliminary negotiations with third parties, including Goldman Sachs, concerning Archipelago and intentionally concealed that information from Borsellino.

¶ 25        Prior to filing their answers, the 2000 defendants, with the exception of Archipelago, filed a motion to dismiss pursuant to sections 2-615 and 2-619(a)(4) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619(a)(4) (West 1998)). The defendants claimed that the complaint failed to state a claim against any of the defendants and that all of the claims were barred by the prior judgment entered in the 1998 suit because: (1) the claim was barred by *res judicata*, (2) the plaintiffs impermissibly filed the 2000 complaint without first vacating the 1998 judgment under section 2-1401 of the Code (735 ILCS 5/2-1401 (West 1998)), (3) Borsellino lacked standing to seek any relief other than rescission of the settlement agreement, and (4) the parties were not in a fiduciary relationship. Archipelago also filed a motion to dismiss pursuant to section 2-615 of the Code, claiming that the 2000 complaint should be dismissed on the basis of *res judicata*[10] and based on the terms of the settlement agreement; Archipelago also claimed that the complaint failed to state a cause of

[9]Although the derivative suit was filed by IMA and IMA was a member of CTA, the complaint refers to Borsellino in his individual capacity.

[10]Archipelago requested that, should the trial court determine that the proper vehicle for raising the *res judicata* claim is section 2-619, the court should consider its motion as arising under that provision.

action on any of the counts against Archipelago.

¶ 26    On April 11, 2001, the trial court dismissed the suit with prejudice pursuant to section 2-619 of the Code on the basis of *res judicata*, finding that there were no allegations of intentional fraud or misstatements made during settlement negotiations. Borsellino and IMA filed a motion to vacate the dismissal order and requested leave to file an amended complaint setting forth intentional misrepresentations that they claimed had recently become known to them.

¶ 27    On May 7, 2001, the trial court denied the motion to vacate concerning Archipelago. The court also denied the motion to vacate against the other defendants without prejudice and permitted Borsellino and IMA time to file a motion for leave to file an amended complaint. The court told the plaintiffs' attorney that "if you can actually plead that [the defendants] did something during the settlement negotiations, I will look at an amended complaint to see whether you can file it. If this is it, it doesn't cut it."

¶ 28    On May 17, 2001, Borsellino and IMA again filed a motion to vacate the dismissal order, asking that the portion of the order dismissing the case with prejudice be vacated and that they be permitted to file an amended complaint. After a hearing on November 14, 2001, at which Borsellino identified an additional allegation of an affirmative misrepresentation by the 2000 defendants, the trial court granted the motion to vacate the dismissal order and permitted Borsellino and IMA to file an amended complaint. During the hearing on the motion, counsel for Borsellino stated:

   "[Section 2-1401 is] not a requirement. That allows us the opportunity, if we chose to do it that way. Instead, we've decided to affirm that and seek a new action of fraud.

   If we file under 2-1401, we're seeking a rescission of that agreement and you have to meet certain requirements. It is not a mandatory requirement under Illinois or any other state that says how you can approach a new fraud."

¶ 29    Borsellino and IMA filed a verified amended complaint on November 15, 2001. The amended complaint was filed solely against Putnam, Marrgwen Townsend, and CTA, and contained a single count for fraud. The complaint removed a number of allegations present in the 2000 complaint and added five specific statements that Borsellino alleged were material misrepresentations made by Putnam and Marrgwen Townsend. The amended complaint also included recently discovered information that contrary to the defendants' representations, CTA funds were used to develop Archipelago. The complaint sought compensatory and punitive damages, each in excess of $40 million. The complaint did not request rescission of the settlement agreement, but included an allegation that, "[d]ue to the fraudulent conduct of Putnam and [Marrgwen] Townsend, *** the parties' prior settlement agreement of the derivative action is void."

¶ 30    On January 16, 2002, the plaintiffs filed a verified second amended complaint, essentially identical to the amended complaint but adding newly discovered information concerning discussions with Goldman Sachs.

¶ 31    On November 12, 2002, the defendants filed a motion to dismiss the second amended complaint pursuant to section 2-619 of the Code, claiming that the release barred the plaintiffs' claim as a matter of law. Alternatively, the defendants asked the court to strike

-8-

allegations that the defendants committed fraud by omission.

¶ 32    On March 12, 2004, the plaintiffs filed a motion to amend their complaint. The proposed third amended complaint added six counts to the single fraud count present in the second amended complaint. At a hearing on March 22, 2004, the plaintiffs informed the court that they intended to file a new complaint alleging the same facts and pursuing the same relief as the amended complaint that they sought leave to file.

¶ 33                                    VI. 2004 Suit

¶ 34    On March 23, 2004, while the motion to dismiss the second amended complaint in the 2000 suit was pending, Borsellino and IMA filed suit against Stuart Townsend, GDP, Terra Nova, TAL, Virago, and two Archipelago-related companies.[11] The 2004 complaint contained seven counts:[12] (1) rescission of the settlement agreement, (2) breach of fiduciary duty against Stuart Townsend, (3) fraud against Stuart Townsend, (4) unjust enrichment, (5) accounting, (6) piercing the corporate veil against Terra Nova, and (7) civil conspiracy.

¶ 35    The complaint set forth similar allegations as in the 2000 complaints. However, for the first time, the complaint set forth specific allegations concerning the events of the settlement meeting. The complaint alleged that the settlement meeting was held in the office of one of Borsellino's attorneys. Borsellino was present with two attorneys and Putnam and the Townsends were present with their attorney. Borsellino's attorneys began the meeting by discussing the basic allegations made in the 1998 derivative suit. When the attorneys mentioned Archipelago, "Putnam stated that Archipelago had nothing to do with" CTA. The attorney for Putnam and the Townsends also claimed that Archipelago was a separate business.

¶ 36    The complaint alleged that Borsellino grew tired of hearing the attorneys argue and asked them to leave the room, leaving him alone with Putnam and the Townsends. Once the attorneys left, Borsellino asked Putnam and the Townsends whether any CTA funds were used to start Archipelago. They assured Borsellino that Archipelago was a separate business and that no CTA funds were used for the benefit of Archipelago. They had the same response when Borsellino asked them about the remote SOES trading rooms that they had established and the RealTick software. Borsellino questioned them about CTA's profitability, and Putnam and the Townsends assured Borsellino that CTA was a failing business. The complaint requested, *inter alia*, rescission of the settlement agreement, an accounting, and unspecified compensatory and punitive damages.

---

[11]According to Borsellino's complaint, defendant ArcaEx, or Archipelago Exchange, was an electronic stock exchange approved by the SEC in 2001. All of the securities originally in the Archipelago ECN were eventually moved to ArcaEx, at which time Archipelago ceased operations. Defendant Archipelago Holdings, L.L.C., was the parent company of Archipelago and ArcaEx. ArcaEx and Archipelago Holdings were eventually dismissed from the 2004 suit.

[12]Several of the "counts" are not independent causes of action, but relate to other causes of action set forth in the complaint. However, we list them as they appear in the complaint.

¶ 37    On March 24, 2004, Putnam, Marrgwen Townsend, and CTA (the remaining defendants in the 2000 suit), filed an emergency motion to enjoin the plaintiffs from filing the new 2004 complaint. The court permitted plaintiffs to file the 2004 complaint, but ordered them to defer service of the summons on the 2004 defendants.

¶ 38    On October 27, 2004, the trial court issued a written memorandum opinion and order denying the 2000 defendants' motion to dismiss the plaintiffs' second amended complaint pursuant to section 2-619 of the Code. The court found that the release did not bar the filing of the 2000 suit, since the alleged misrepresentations made during settlement discussions could not have been within the contemplation of the parties. The court also rejected the 2000 defendants' argument that by retaining the $250,000 payment, Borsellino ratified the settlement agreement. Finally, the court refused to strike the allegations of fraud by omission, finding that the parties remained fiduciaries at the time of the settlement agreement.

¶ 39    On September 27, 2005, the trial court granted the plaintiffs leave to file a third amended complaint in the 2000 suit solely for the purposes of updating the allegations of misrepresentation in the single-count fraud claim pled in the second amended complaint, which they did.

¶ 40    On October 17, 2005, the 2000 defendants filed a motion to dismiss the plaintiffs' third amended complaint pursuant to section 2-619 of the Code. They claimed that Borsellino lacked standing to pursue the suit in his individual capacity, that CTA could not be liable as a matter of law, and that Putnam and Marrgwen Townsend owed no duties to Borsellino or IMA.

¶ 41    On February 9, 2006, at a hearing on the 2000 defendants' motion to dismiss, the court denied their motion to dismiss Borsellino, but granted their motion to dismiss CTA as a party defendant with prejudice. The court also *sua sponte* dismissed IMA as a plaintiff with prejudice because the action was brought against Putnam and Marrgwen Townsend individually, and, "[i]n my view [an action by IMA] should be brought against the other members of the big LLC." Finally, the court denied the defendants' request to strike the portions of the complaint concerning the defendants' duty to disclose. Thus, following the February 9, 2006, order, Borsellino was the sole remaining plaintiff and Putnam and Marrgwen Townsend were the defendants in the 2000 suit.

¶ 42    On March 29, 2006, the trial court entered an order consolidating the 2000 suit and the 2004 suit.

¶ 43    On April 20, 2006, the plaintiffs filed a motion to reconsider the portion of the trial court's February 9, 2006, order that dismissed IMA as a plaintiff in the 2000 suit.

¶ 44    On June 14, 2006, the 2004 defendants filed a number of motions to dismiss the 2004 complaint under both section 2-615 and section 2-619 of the Code, including claims that (1) the claims were untimely and barred by the statute of limitations, (2) the claims were barred by the law of the case, (3) the plaintiffs had no standing, (4) *res judicata* barred the claims, and (5) the claims were barred by the 1998 order of dismissal, which was never vacated pursuant to section 2-1401 of the Code.

¶ 45    On June 26, 2006, the 2000 defendants filed a motion to reconsider the court's ruling on their 2-619 motion to dismiss the third amended complaint. The defendants claimed that the

court erred in permitting Borsellino to maintain an individual claim.

¶ 46    On July 14, 2006, the defendants filed a motion to dismiss the 2004 complaint pursuant to section 2-619(a)(5), claiming it was filed after the expiration of the applicable statute of limitations.

¶ 47    On September 26, 2006, the court entered an order granting the plaintiffs leave to file an amended complaint in the 2004 suit containing two counts, in lieu of responding to the 2004 defendants' pending motions to dismiss. Defendants Terra Nova and TAL were dismissed with prejudice, as were five counts of the 2004 complaint.

¶ 48    On September 27, 2006, the plaintiffs filed an amended complaint in the 2004 case against Stuart Townsend, GDP, and Virago. The complaint contained two counts, one on behalf of Borsellino and one on behalf of IMA, alleging breaches of fiduciary duty and fraud and seeking compensatory and punitive damages.

¶ 49    On November 6, 2006, the 2004 defendants filed a motion to dismiss the claim brought on Borsellino's behalf pursuant to section 2-619(a)(2) of the Code, claiming that Borsellino lacked standing.

¶ 50    On July 17, 2007, the trial court entered an order on a number of motions, in which the court denied the defendants' motions to dismiss the 2004 claims pursuant to (1) violation of the statute of limitations, (2) the release, (3) the doctrine of *res judicata*, and (4) violation of section 2-1401 of the Code; the court also denied the 2004 defendants' motion to dismiss Borsellino's claims due to a lack of standing. The court additionally denied Stuart Townsend's motion to dismiss the claims against him in the 2004 action due to a lack of fiduciary duty. The court further denied the 2000 defendants' motion to reconsider the prior order denying dismissal of Borsellino from the 2000 action due to a lack of standing. The court denied the plaintiffs' motion to reconsider the prior order of dismissal of IMA from the 2000 action and ordered that if Borsellino prevailed on liability, he was permitted to seek damages for losses from the formation of their business relationship through March 4, 2008, but not later. The court dismissed IMA, GDP, and Virago from the consolidated cases with prejudice and found there was no just reason to delay enforcement or appeal of the order of dismissal pursuant to Illinois Supreme Court Rule 304(a) (eff. Jan. 1, 2006). The dismissal of IMA, GDP, and Virago was affirmed on appeal. *Borsellino v. Putnam*, No. 1-07-3233 (2009) (unpublished order under Supreme Court Rule 23). Thus, after the court's order, the sole plaintiff remaining in the consolidated action was Borsellino, and the defendants consisted of (1) the 2000 defendants: Putnam and Marrgwen Townsend; and (2) the 2004 defendant: Stuart Townsend.

¶ 51    On August 4, 2009, defendants filed a motion for summary judgment, setting forth three bases for summary judgment: (1) there were no false representations because none of the corporate opportunities belonged to CTA and no CTA assets were used to develop them; (2) Borsellino did not justifiably rely on any alleged misrepresentations; and (3) Borsellino lacked standing to sue for the loss of the value of corporate opportunities that were claimed belong to CTA. The trial court denied the motion for summary judgment, but found that affirmative representations about RealTick and the remote SOES rooms that were inconsistent with the 1998 complaint would not be a basis for sustaining the fraud claim.

However, the court ordered that evidence concerning the development of RealTick and the SOES remote rooms would be permitted for purposes of proving whether Archipelago was a business opportunity of CTA.

¶ 52    On September 23, 2009, the trial court ruled on the parties' motions *in limine*. Borsellino had filed a number of motions *in limine*, including a motion to bar reference to "allegations of extramarital, nonconsensual sexual encounters" with two women, Nicole P. and Angela S., which Borsellino claimed would be used by the defendants to provide a motivation to end their business relationship with him. The court permitted defendants to "set the tone" of the meeting and discuss the general subject matter of the meeting, but did not permit them to reveal the alleged victims' names or the fact that the misconduct claimed was sexual assault.

¶ 53                                    VII. Trial

¶ 54    Trial began on October 15, 2009. In their appellate brief, defendants emphasize that while they disagree with the factual findings of the jury, they are not appealing any issues concerning the weight of the evidence, nor are they appealing the jury's finding that Archipelago was a business opportunity of CTA. Accordingly, we relate only the testimony that is the subject of issues on appeal.

¶ 55                            A. Borsellino's Testimony

¶ 56    Borsellino testified that IMA dissolved in "around 2000." When asked what he did with the company's assets, Borsellino responded, "I just gave them to myself."

¶ 57    Borsellino also testified concerning his goal for filing the derivative action:

> "My goal for this whole thing was to get those three to talk to me, basically to get the three of them in a room. And basically say, hey, look, what happened here, where did all of the assets go, what happened to this company and why is it gone."

¶ 58    Borsellino testified that he received a telephone call from Marrgwen Townsend within a day or two of his filing the 1998 suit, asking for a meeting. Borsellino testified concerning his mindset at the time Marrgwen Townsend suggested the meeting:

> "So my frame of reference was, look, I really wanted to get Marrgwen and Stuart in the room. *** I really at this point didn't trust [Putnam].
>
> Q. You did not trust [Putnam]?
>
> A. Absolutely not."

¶ 59    Borsellino testified that the meeting leading to the settlement agreement took place at the end of February 1998 in the office of one of his attorneys. Borsellino was present with two attorneys and Putnam and the Townsends arrived with their attorney. Borsellino testified that when he went into the settlement meeting, he estimated the amount he was seeking as "like between 450,000 and 500,000" and testified that choosing the amount was "basically a guess" due to the lack of information. The attorneys began discussing the assets of the company, and defendants' attorney indicated that Archipelago was a separate business than CTA and that Putnam and the Townsends no longer wished to be in business with Borsellino. Borsellino testified that the entire meeting was approximately one hour long and

that the portion with the attorneys took approximately half an hour. During the portion when the attorneys were present, Borsellino testified that they were not "getting anywhere" and the attorneys became frustrated with each other.

¶ 60 Borsellino testified that he told the attorneys to leave so that Borsellino, Putnam, and the Townsends could speak alone. When asked whether Borsellino trusted the partnership, given that he had already testified that he did not trust Putnam, Borsellino responded:

"I was–did I trust Gerry? No. But I didn't think that Gerry would, you know, lie with those two in the room. I thought Gerry would tell the truth and that they would be the people that would sort of balance this partnership out and tell us what was going on."

¶ 61 Borsellino further testified that he believed he had the right to rely on what they told him: "In a partnership, everybody's got to be a good partner." He testified that he told the others that he simply wanted what was rightfully his, and then "I'll go on with my life, you go on with your life." He testified that they all told him that Archipelago was unrelated to CTA and that Marrgwen Townsend told him that Archipelago was a software project that the Townsends had previously been working on. Borsellino testified that he was satisfied that they were telling him the truth.

¶ 62 Borsellino testified that they also discussed the personnel matter during the meeting, because he was upset with the way that it had been handled. However, Borsellino denied that it was the sole focus of the conversation. On cross-examination, Borsellino acknowledged being angry and raising his voice during the discussion.

¶ 63 Once Borsellino was convinced that CTA did not have an interest in any other business that had not been disclosed, they discussed settlement. Borsellino requested $250,000, saying that after the probable attorney fees, "I'm lucky to break-even–you know, have a little money for my aggravation. And I'll go on with my life." Putnam told Borsellino that he was unable to pay his half of the settlement amount, and Putnam and the Townsends left the room briefly. When they returned, the Townsends said that they would provide Putnam's portion and that they would buy Borsellino's interest for $250,000. Borsellino testified that he would not have agreed to release his rights and sell his interest in CTA for that amount had he known that Goldman Sachs was interested, even if they had merely been "sniffing around," because that would have indicated that they saw something valuable in the business.

¶ 64 After Borsellino had completed his testimony, outside the presence of the jury, defendants' attorney made an offer of proof considering issues surrounding the 1998 verified complaint that the trial court restricted him from pursuing. The attorney stated that Borsellino testified on direct examination that he did not seek damages other than the cost of bringing the suit. However, the attorney further stated, Borsellino in fact sued for breach of fiduciary duty and asked for over $100,000 in damages. He stated that "[t]his Court has essentially allowed Mr. Borsellino to perjure himself on this point and bar the Defense from cross examining Mr. Borsellino regarding the numerous statements he made under oath in the 1998 lawsuit accusing my clients of stealing the corporate assets of CTA to create Archipelago. This Court has not allowed the Defendants a fair opportunity to challenge Mr. Borsellino on this point."

## B. Putnam's Testimony

Putnam testified that he and the Townsends wanted to close CTA for two reasons: the business was losing money and the personnel issue with Borsellino that occurred in March 1997. Putnam acknowledged that Borsellino was entitled to information concerning CTA:

> "Q. He's a partner, he's got one-third interest in the partnership?
>
> A. Correct.
>
> Q. And he's entitled to just as much information as you got, right?
>
> A. Correct."

Putnam testified that the settlement meeting was "unpleasant" and "tense." Putnam testified that during the portion of the settlement meeting without attorneys present, CTA and Archipelago were never discussed. He testified that they discussed the personnel issue; he described it as a "one-way conversation" with Borsellino being angry and upset. Putnam testified that the issue of money never came up after the portion of the meeting with the attorneys.

## C. Marrgwen Townsend's Testimony

Marrgwen Townsend testified that it was her understanding that when CTA was formed, the members would be entities created by the parties. Since Virago was not yet in existence, the Townsends used TAL as the member entity. However, Marrgwen Townsend testified that she later learned that the paperwork was not properly filed and was not filed until December 1996.

Marrgwen Townsend denied making any affirmative representations to Borsellino that CTA assets were not used in the formation of Archipelago. She further denied that the subject of Archipelago arose during the private portion of the settlement meeting; she testified that Borsellino wanted to "yell" at them about the personnel matter. However, had the subject come up, she testified that her response would have been "[t]hat Archipelago had nothing to do with CTA. It wasn't his business."

## D. Stuart Townsend's Testimony

Stuart Townsend agreed that at the time of the settlement meeting, he had a duty "to treat [Borsellino] fairly and honestly." He characterized the relationship with Borsellino at the time of the settlement meeting as being "at swords [*sic*] point," testifying that "[h]e was suing us. He was an adversary." He further testified:

> "I wouldn't feel that it was my obligation to make sure that someone who's in a room to settle a lawsuit with me understands everything that's going on. It's up to him to know that. We're at swords point. He's on the other side of the deal."

He denied saying anything about Archipelago at the meeting.

## E. Jury Instructions

The trial court gave the jury the following jury instruction, which was proposed by

Borsellino and given over defendants' objections:

"Defendants Gerald Putnam, Marrgwen Townsend, and Stuart Townsend were in a fiduciary relationship with Plaintiff Lewis Borsellino.

As such, Gerald Putnam, Marrgwen Townsend, and Stuart Townsend must show by clear and convincing proof that they made a full and frank disclosure to Mr. Borsellino of all material information which they knew during the meeting on February 21, 1998 and that they treated Mr. Borsellino honestly.

If you find that Defendant(s) have made this showing, then your verdict should be for the Defendants.

If, on the other hand, you find that Defendant(s) have failed to make this showing, then you should go on to consider whether Plaintiff has shown that he reasonably relied on the Defendant(s)' conduct and suffered damages from it. Plaintiff must show one or both of the following two propositions by clear and convincing proof:

Proposition One: (1) that Plaintiff reasonably believed the statement(s) and acted in justifiable reliance on the truth of the statement(s), and (2) that his damages resulted from this reliance; or

Proposition Two: (1) that Plaintiff acted in justifiable reliance on the facts as he knew them, and (2) his damages resulted from the withholding of material fact(s) by the Defendant(s).

If you find from your consideration of all the evidence that the Plaintiff has proven either or both of these two things, then your verdict should be for the Plaintiff.

On the other hand, if you find from your consideration of all the evidence that neither of these propositions has been proven as required in this instruction, then your verdict should be for the Defendant(s)."

¶ 76    The trial court also gave the following jury instruction concerning the measure of damages:

"If you decide for the Plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for damages proved by the evidence to have resulted from the conduct of the Defendant(s):

The value of Lewis Borsellino's 1/3rd interest in Chicago Trading & Arbitrage, including the value to be determined by you of Archipelago on March 4, 1998.

Whether this element of damages has been proved by the evidence is for you to determine."

¶ 77    On November 3, 2009, the jury found in Borsellino's favor against all three defendants and awarded him $11 million in damages.

¶ 78                              VIII. Posttrial Proceedings

¶ 79    On November 5, 2009, Borsellino filed a motion seeking an award of prejudgment interest.

¶ 80    On December 7, 2009, Borsellino filed a motion for leave to file amended complaints to

conform the pleadings in the 2000 and 2004 complaints to the proof at trial; Borsellino sought to add a request for prejudgment interest to the complaints. On January 7, 2010, the trial court granted Borsellino's motion and granted him leave to file the third amended complaint in the 2004 case and the fourth amended complaint in the 2000 case, adding requests for prejudgment interest.

¶ 81    On March 9, 2010, Borsellino filed a postjudgment motion for a new trial solely on the issue of punitive damages. Borsellino claimed that the trial court erred by declining to give his proposed jury instruction concerning punitive damages. On March 10, 2010, defendants filed a posttrial motion requesting the trial court to enter judgment notwithstanding the verdict in their favor, reduce the amount of the judgment, or, in the event that the court found Borsellino entitled to a new trial, to include the issue of liability for compensatory damages and to reverse certain rulings made by the court.

¶ 82    The trial court reduced the amount of the damages award by the $250,000 that Borsellino received pursuant to the settlement agreement and added $30,000 in costs. A total judgment of $10.78 million was entered on January 11, 2010. The court further awarded Borsellino interest from the date the verdict was returned, as well as approximately $1.5 million in prejudgment interest.

¶ 83    On July 7, 2010, the trial court entered an agreed order on defendants' posttrial motion and Borsellino's postjudgment motion for a new trial on the issue of punitive damages, in which the court granted defendants' posttrial motion in part and vacated the award of prejudgment interest. The court denied defendants' posttrial motion in all other respects and denied Borsellino's postjudgment motion for a new trial on the issue of punitive damages.

¶ 84    On August 2, 2010, defendants filed a notice of appeal requesting the appellate court to reverse the judgment against them and enter judgment notwithstanding the verdict. Defendants further requested that, in the event that the appellate court grants the relief requested by Borsellino on his appeal, they be given a new trial. On August 3, 2010, Borsellino filed a notice of appeal requesting the appellate court to vacate the trial court's ruling that denied the jury the opportunity to decide punitive damages and remand for a new trial on that issue only.

¶ 85                                                    ANALYSIS

¶ 86    On appeal, defendants request reversal of the trial court's judgment for four reasons: (1) Borsellino lacked standing, (2) the claim is barred by the release and the judgment in the 1998 lawsuit, (3) the cause of action under which Borsellino recovered is not recognized under Illinois law, and (4) Borsellino failed to establish that defendants owed him fiduciary duties and that he reasonably relied on their representations. Defendants also argue that the amount of damages awarded Borsellino were not legally available to him and request that the amount of the judgment be reduced if not reversed. In his cross-appeal, Borsellino requests a new trial on the issue of punitive damages and asks for the trial court's award of prejudgment interest to be reinstated. In the event that Borsellino prevails on his cross-appeal, defendants also request a new trial based on four rulings made by the trial court: (1) the jury instruction on burden of proof, (2) two evidentiary rulings, and (3) the trial court's

limitation on defendants' cross-examination of Borsellino.

¶ 87 Prior to considering the issues on appeal, we first briefly address an issue raised in defendants' reply brief, in which they ask us to strike the statement of facts in Borsellino's response brief. They claim that Borsellino's 49-page statement of facts violates Illinois Supreme Court Rule 341(h) (eff. July 1, 2008), which requires a brief's statement of facts to "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Defendants claim that Borsellino's statement of facts is argumentative and lacks sufficient record citations. However, defendants did not file a formal motion to strike the statement of facts as required, but included the issue as an additional argument in their reply brief. See *John Crane, Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009). Additionally, we do not find any deficiencies in the statement of facts to be so egregious as to warrant striking it. See *Lock 26 Constructors v. Industrial Comm'n*, 243 Ill. App. 3d 882, 886 (1993) (declining to strike statement of facts where it did not contain rules violations so flagrant that they hindered review of the issues). Accordingly, we decline to strike Borsellino's statement of facts and proceed to the merits of the parties' arguments.

¶ 88                                      I. Standing

¶ 89 Defendants first argue that Borsellino lacked standing to sue. They claim that the underlying issue of whether Archipelago was a corporate opportunity of CTA was a derivative claim that could only have been filed on CTA's behalf and, therefore, Borsellino had no interest in the consolidated suit. The question of whether a party has standing is reviewed *de novo*. *Malec v. City of Belleville*, 384 Ill. App. 3d 465, 468 (2008) (quoting *Dimensions Medical Center, Ltd. v. Advanced Ambulatory Surgical Center, Inc.*, 305 Ill. App. 3d 530, 534 (1999)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Kahn v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 90 "The doctrine of standing requires that a party, either in an individual or representative capacity, have a real interest in the action brought and in its outcome." *In re Estate of Wellman*, 174 Ill. 2d 335, 344 (1996). The purpose of standing is to ensure that courts are deciding actual, specific controversies and not abstract questions or moot issues. *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 279-80 (1989). "The essence of the inquiry regarding standing is whether the litigant, either in an individual or representative capacity, is entitled to have the court decide the merits of a dispute or a particular issue." *Wellman*, 174 Ill. 2d at 345 (citing *Helmig v. John F. Kennedy Community Consolidated School District No. 129*, 241 Ill. App. 3d 653, 658 (1993)).

¶ 91 In Illinois, standing requires only some injury in fact to a legally cognizable interest. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988). "The claimed injury, whether actual or threatened, must be distinct and palpable, fairly traceable to the defendant's actions, and substantially likely to be prevented or redressed by the grant of the relief requested." *Village of Chatham, Illinois v. County of Sangamon, Illinois*, 216 Ill. 2d 402, 419-20 (2005).

¶ 92 In the case at bar, defendants argue that Borsellino lacked standing. They claim that the

damages alleged in all three lawsuits were damages sustained solely by CTA: they argue that the 1998 lawsuit alleges damages to CTA concerning diversion of its corporate opportunity and assets to Archipelago, and that the 2000 and 2004 suits alleged damages resulting from CTA's release of its corporate opportunity and asset diversion claims. They further claim that even if IMA was permitted to bring suit concerning its own damages from the settlement of the lawsuit, IMA was dismissed from the case. Defendants argue that Borsellino never alleged or presented evidence of any damages he suffered personally as a result of the fraud and only attempted to claim the same damages that were asserted on CTA's behalf in the derivative suit. We do not find defendants' arguments persuasive.

¶ 93    Defendants correctly note that the same general issues were involved in all three lawsuits: whether Archipelago was a corporate opportunity of CTA. However, defendants err in concluding that because the same facts were at issue in the three lawsuits, any damages belonged to CTA or, at most, to IMA. In fact, the 1998 derivative suit was distinct from the 2000 and 2004 suits. While the 1998 suit alleges that CTA's corporate opportunities had been usurped and its assets used impermissibly, both the 2000 and 2004 suits involved claims for fraud in the framing of the settlement agreement to the 1998 suit. While the issue of whether Archipelago was a corporate opportunity of CTA arose in all three lawsuits, it was only relevant in the consolidated case to assist in determining whether any misrepresentations or material omissions were made by defendants: if Archipelago was not a corporate opportunity of CTA, then defendants would have had no duty to disclose that it was, and any statements made to that effect by defendants would not have been false.

¶ 94    In the cause of action at issue here–fraud in the framing of the settlement agreement–we find that Borsellino has standing. While Borsellino makes a number of arguments he claims support a finding of standing, we discuss only the argument we find most persuasive. The executed agreement was not merely a settlement of the 1998 suit but was also a mutual release, which Borsellino signed both on IMA's behalf and individually. Thus, by the terms of the release, Borsellino personally released Virago, TAL, Archipelago, GDP, Terra Nova, Putnam, and the Townsends

> "from all claims, demands, damages, suits, judgments, debts, obligations, actions or causes of action, settlements and demands of any nature, whether sounding in contract or in tort, whether based on statute, common law, rule or regulations, whether in law or in equity, whether direct or consequential, compensatory or exemplary, liquidated or unliquidated, known or unknown, which either party hereto now has or ever had or which its respective successors or assigns hereafter shall or may have, on or at any time prior to the date of this Settlement Agreement and Mutual Release including those claims asserted in the Verified Complaint for Derivative and Other Relief, filed in the Circuit Court of Cook County, Illinois, and entitled, <u>I.M. Acquisitions, L.L.C. v. Chicago Trading & Arbitrage</u>, Case No. 98 CH 1363 ***."

Borsellino had a legally cognizable interest in releasing any claims he had against the individuals and companies named in the release. Moreover, Borsellino alleges that had defendants not made misrepresentations concerning Archipelago and CTA, he would not have executed the settlement agreement. Accordingly, by alleging that he would not have executed the release had defendants not made certain misrepresentations, Borsellino alleges

damages to a legally cognizable interest–his interest in personally releasing any claims he had against defendants.

¶ 95 Defendants claim that Borsellino lacks standing because the damages actually awarded were based on the usurpation of CTA's corporate opportunity, damages that properly belonged to CTA. However, the issue of whether Borsellino is entitled to the damages awarded by the jury is a question of the appropriateness of the damages, not a question of standing, and in fact is an issue that defendants raise independently as a basis for reducing the damages award. For purposes of standing, it is sufficient that Borsellino showed that he would not have executed the settlement agreement and release were it not for defendants' misrepresentations.

¶ 96 Additionally, we find defendants' reliance on *Spirit of Excellence, Ltd. v. Intercargo Insurance Co.*, 334 Ill. App. 3d 136 (2002), to be inapposite. In *Spirit of Excellence*, the plaintiff, an exporter of goods, contracted to provide used vehicles for shipment to Russia. *Spirit of Excellence*, 334 Ill. App. 3d at 139. The purchaser of the vehicles prepaid the plaintiff for the costs of shipping, and prior to the transportation of the vehicles, the plaintiff issued commercial invoices evidencing the sale to the purchaser. *Spirit of Excellence*, 334 Ill. App. 3d at 139. The vehicles were damaged in the shipping process, and the assignee of the purchaser filed a bankruptcy claim after the plaintiff filed for bankruptcy. *Spirit of Excellence*, 334 Ill. App. 3d at 141-42. The plaintiff's insurance company denied coverage for all claims submitted, and the plaintiff filed suit against the insurance company for breach of contract, as well as against the shipper for negligence. *Spirit of Excellence*, 334 Ill. App. 3d at 143. Shortly before trial, the trial court entered summary judgment in favor of the insurance company and granted the shipper's motion to dismiss, both on the basis that the plaintiff could not establish that it had suffered any damages because all damages were suffered by the plaintiff's creditor, including the purchaser's assignee. *Spirit of Excellence*, 334 Ill. App. 3d at 144.

¶ 97 On appeal, the appellate court affirmed the trial court, finding that the plaintiff lacked standing because the claims belonged to the creditor. *Spirit of Excellence*, 334 Ill. App. 3d at 147. The court noted that the record established that the only damages the plaintiff was seeking were identical to the bankruptcy claim filed by the purchaser's assignee after the plaintiff filed for bankruptcy and that the trial court "properly determined that [the plaintiff] lacks standing to bring this action for claims which in fact belong to a third-party creditor." *Spirit of Excellence*, 334 Ill. App. 3d at 147.

¶ 98 Defendants use *Spirit of Excellence* to argue that Borsellino, like the plaintiff in that case, was attempting to receive damages for a claim that properly belonged to CTA–the claim for usurpation of CTA's corporate opportunity. However, as noted, the claim in the consolidated suit was for fraudulently misrepresenting that Archipelago was not a corporate opportunity of CTA at the settlement conference, thereby inducing Borsellino to execute the release and settlement agreement. Thus, Borsellino had damages that he suffered personally, which are not necessarily identical to the damages suffered by CTA due to the usurpation or the damages suffered by IMA due to the fraud in the inducement of the settlement agreement. Accordingly, we find that Borsellino has standing.

¶ 99                                    II. 1998 Suit

¶ 100    Defendants next claim that several aspects of the 1998 suit bar Borsellino's claim. They argue that (1) the release barred the instant claim and (2) the claim is barred by *res judicata*.[13]

¶ 101                                    A. Release

¶ 102    Defendants argue that Borsellino's claims are barred by the terms of the release. They claim that after discovery of the alleged fraud in the negotiations, Borsellino failed to seek rescission of the release and retained the $250,000 payment. Thus, they claim that Borsellino ratified the release and is bound by its terms, which would preclude him from raising any claims that occurred during the negotiation of the release.

¶ 103    A release " 'is the abandonment of a claim to the person against whom the claim exists.' " *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 21 (2003) (quoting *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 88 (1999)); *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 614 (2007). It is a contract and is therefore governed by contract law. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991) (citing *Polo National Bank v. Lester*, 183 Ill. App. 3d 411, 414 (1989)). The interpretation of a contract involves a question of law, so we review it *de novo*. *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007) (citing *People ex rel. Department of Public Health v. Wiley*, 218 Ill. 2d 207, 223 (2006)).

¶ 104    The first question we consider is whether the release was in effect, given Borsellino's allegations that defendants committed fraud during the negotiations leading to the execution of the settlement agreement and release. Fraud in the inducement of a contract renders the contract voidable. *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1030 (2007) (citing *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 164 (2004)). Thus, while the perpetrator of the fraud cannot enforce it, the innocent party may either rescind the contract or "choose to waive the defect, ratify the contract, and enforce it." *Tower Investors*, 371 Ill. App. 3d at 1030 (citing *Illinois State Bar Ass'n Mutual*, 355 Ill. App. 3d at 164-65). Typically, a release that has been procured through fraud is rescinded. See, *e.g.*, *Richardson v. Economy Fire & Casualty Co.*, 109 Ill. 2d 41, 47-48 (1985) (noting that "plaintiffs have not sought to have the release rescinded, which traditionally has been the procedure utilized to avoid the effect of a fraudulently obtained release where, as here, the fraud complained of relates to the consideration received in exchange for signing the release"). However, while it is a less common factual situation, courts have found that ratification is also available in the context of a release.

¶ 105    For instance, the court in *Golden v. McDermott, Will & Emery*, 299 Ill. App. 3d 982 (1998), considered a release executed by the plaintiff as part of a severance agreement. The

_____

[13]In their brief, defendants raise a third issue concerning the 1998 suit: whether Borsellino was required to proceed by petitioning the trial court for relief from judgment pursuant to section 2-1401 of the Code. However, since resolution of that issue depends on whether Borsellino's claim is recognized under Illinois law, we do not consider it at this point in our opinion.

plaintiff was a partner in the defendant law firm who was responsible for bringing in a certain client. *Golden*, 299 Ill. App. 3d at 985. A class action suit was filed against the client, and the firm was named as a defendant; the lawsuit sought $120 million from the firm. *Golden*, 299 Ill. App. 3d at 985. The firm had a malpractice insurance policy, and the insurance company stated that the claims were the largest that it had ever been required to cover for any firm. *Golden*, 299 Ill. App. 3d at 985. After the litigation settled, the plaintiff was informed that he was being fired due to pressure from the firm's insurance company, but he was given the opportunity to resign first. *Golden*, 299 Ill. App. 3d at 986-87. The parties drafted a severance agreement, which contained a release of " 'any and all claims *** whether now known or unknown *** including, but not limited to, any and all claims *** relating to or arising out of [the plaintiff's] partnership, tenure or separation from the firm' " other than actions to enforce the severance agreement and a provision enabling the plaintiff to file suit against the insurance company "for getting him fired." *Golden*, 299 Ill. App. 3d at 986. In late 1991, after the severance agreement had been executed, the plaintiff learned that the management committee of the firm had not voted on his expulsion as required by the firm's partnership agreement. *Golden*, 299 Ill. App. 3d at 987. In 1992, the plaintiff received and accepted a payment of $225,000 in consideration of the release. *Golden*, 299 Ill. App. 3d at 986.

¶ 106       In 1995, the plaintiff filed suit against the insurance company, where he discovered facts concerning conduct of the law firm that led him to file suit against the firm in 1996. *Golden*, 299 Ill. App. 3d at 987. The complaint included allegations that the firm violated its partnership agreement by not following the termination procedures outlined there, and that the firm's partners, also named as defendants, committed fraud and breached fiduciary duties owed to the plaintiff as a partner. *Golden*, 299 Ill. App. 3d at 987. The plaintiff argued that the release contained in the severance agreement was voidable because he had signed it under moral and economic duress and because the firm "withheld and misrepresented facts to him in negotiations, in violation of their fiduciary duty." *Golden*, 299 Ill. App. 3d at 987. The trial court dismissed the complaint pursuant to section 2-619 of the Code, agreeing with the firm that the claim for breach of the partnership agreement was barred by the release.

¶ 107       The appellate court found that the plaintiff had not executed the severance agreement under duress, nor did the firm breach its fiduciary duty to the plaintiff because any alleged misrepresentations were not material to the severance agreement. *Golden*, 299 Ill. App. 3d at 991-93. Furthermore, the court held that even if the severance agreement was voidable due to duress or breach of fiduciary duty, the plaintiff had ratified the agreement by his conduct. *Golden*, 299 Ill. App. 3d at 993. The court noted that "[a] victim of fraud who, knowing of the fraud, 'accepts the benefits flowing from a contract for any considerable length of time ratifies the contract.' " *Golden*, 299 Ill. App. 3d at 993 (quoting *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 842 (1995)). The court held that the plaintiff had ratified the severance agreement by accepting a large amount of money under the agreement, "despite the fact that he was on notice at that point of facts that he says made the agreement voidable," and retained the money for over five years. *Golden*, 299 Ill. App. 3d at 993. The court found that given the release's broad terms, the claims raised by the plaintiff, including the claims for breach of fiduciary duty and fraud, were barred. *Golden*, 299 Ill. App. 3d at 994.

¶ 108    Similarly, the court in *Hurd*, 303 Ill. App. 3d 84, considered whether a release had been ratified by the plaintiff. Like in *Golden*, the *Hurd* plaintiff was a partner in the defendant law firm who left the firm. *Hurd*, 303 Ill. App. 3d at 87. The plaintiff signed a separation agreement that included a release. *Hurd*, 303 Ill. App. 3d at 87. Almost three years after the execution of the release, the plaintiff filed suit against the firm, alleging that the firm had breached its partnership agreement and had breached its fiduciary duties to him in a number of ways, including unlawfully withholding his last paycheck " 'until such time that [plaintiff] was coerced into signing a purported release document in violation of the Wage Payment and Collection Act [citation].' " *Hurd*, 303 Ill. App. 3d at 87. The trial court dismissed the plaintiff's claim under section 2-619 of the Code, finding that the release barred the claims raised in the complaint. *Hurd*, 303 Ill. App. 3d at 88.

¶ 109    On appeal, the appellate court considered whether the release was unenforceable. The court first found that the release was not unenforceable due to economic duress. *Hurd*, 303 Ill. App. 3d at 92. The court then rejected the plaintiff's argument that the release was unenforceable due to lack of consideration, finding that the plaintiff had received consideration for the release. *Hurd*, 303 Ill. App. 3d at 93. The court also found that even if the release had been unenforceable, the plaintiff had ratified it by his subsequent conduct. *Hurd*, 303 Ill. App. 3d at 93. The court noted that the plaintiff received the benefits due him under the release, including monetary compensation, the opportunity to purchase his office furnishings, and the ability to remain on the firm's life, health, and disability programs for a period of time. *Hurd*, 303 Ill. App. 3d at 94. The court found that "[a]fter accepting this compensation, plaintiff waited close to three years to file suit. As a result, plaintiff ratified the purportedly unenforceable release." *Hurd*, 303 Ill. App. 3d at 94.

¶ 110    In the case at bar, defendants argue that notwithstanding the merit of Borsellino's fraud allegations, Borsellino remained bound by the terms of the release, since he ratified the release by retaining the payment of $250,000 and by not attempting to rescind the release. We agree. Borsellino retained the $250,000 paid under the release after becoming aware that defendants had made misrepresentations he claimed were sufficient to establish fraud. That alone may not be sufficient to find ratification, given that Borsellino received the funds in 1998 prior to learning of the alleged misrepresentations and filed his first lawsuit in 2000.[14] See *Thornwood*, 344 Ill. App. 3d at 27 (finding no ratification because even if the plaintiff had retained some benefit under the settlement agreement, he timely sought to rescind the settlement agreement and its related releases upon discovering the alleged fraud). However, Borsellino not only retained the payment under the release but also does not seek to rescind

_____

[14]It is not entirely clear when Borsellino learned of the alleged misrepresentations. The 2004 complaint merely states that Borsellino discovered them "[s]ubsequent to" executing the settlement agreement and release, while the 2000 complaint alleges that Borsellino received evidence of fraudulent misrepresentations "a few months ago." An earlier version of the 2000 complaint places the date at approximately January 1999.

the release.[15] In fact, Borsellino affirmatively argues that the release is valid: in his brief, Borsellino states that he "remained bound by the release just as Defendants did," and a large portion of the litigation revolves around whether Borsellino is permitted to sue for monetary damages without seeking rescission of the settlement agreement and release. Regardless of the answer to that question, Borsellino's conduct in pursuing that claim has made it clear that he is not seeking to rescind the release.

¶ 111    Borsellino has not cited one case that shows a party may retain the fruits of a release while still bringing an action that would be barred under the release.[16] Borsellino's citations to cases from other jurisdictions permitting suits for damages for fraud in the inducement of a release do not support this claim, since they did not involve claims that would have been barred under the release or involved parties seeking to rescind the release. See *Industrial Commercial Electric, Inc. v. McLees*, 101 P.3d 593, 597 (Alaska 2004) (noting that the plaintiff sought to challenge the validity of the releases due to fraud, misrepresentation, or duress, so the scope of the releases was not relevant); *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999) (concluding that the scope of the release at issue did not include a claim for fraudulent inducement of the release itself); *Matsuura v. Alston & Bird*, 166 F.3d 1006, 1009 (9th Cir. 1999) (concluding that, under Delaware law, the releases at issue would not be interpreted to bar a claim for fraudulent inducement of the releases themselves). Similarly, *Sims v. Tezak*, 296 Ill. App. 3d 503 (1998), does not speak to this issue, as the agreement at issue in that case was specifically excluded from the terms of the release. See *Sims*, 296 Ill. App. 3d at 505 n.2 ("All parties acknowledge that the release provision to the Settlement Agreement contained the following language: 'However, this release shall not release or affect any rights or claims which may arise under the terms of the Stock Sale Agreement.' Because the present case arises out of the Stock Sale Agreement, plaintiffs have not released the claims they assert here.").

¶ 112    However, at the very least, Borsellino's position removes any question as to whether he has ratified the release. Accordingly, Borsellino remained bound by the release, and if the terms of the release include a release of his present claim for fraud in the inducement of the release, Borsellino was barred from pursuing the instant suit.

¶ 113    Under the terms of the lease, Borsellino released defendants

"from all claims, demands, damages, suits, judgments, debts, obligations, actions or causes of action, settlements and demands of any nature, *** known or unknown, which either party hereto now has or ever had or which its respective successors or assigns

---

[15]We note that in the earlier versions of the 2000 and 2004 complaints, Borsellino included a request for rescission of the release. However, the most recent versions of the complaints have removed the request for rescission and seek only monetary damages. We emphasize that we are not deciding whether rescission would have been available had Borsellino sought it due to a claim for fraud in the inducement of the release.

[16]Indeed, Borsellino's response to defendants' release argument is sparse, essentially relegating it to a footnote contained in his discussion of whether his cause of action is recognized in Illinois and the available damages, in which he dismisses the argument as "bunk."

-23-

hereafter shall or may have, on or at any time prior to the date of this Settlement Agreement and Mutual Release including those claims asserted in the Verified Complaint for Derivative and Other Relief, filed in the Circuit Court of Cook County, Illinois, and entitled, I.M. Acquisitions, L.L.C. v. Chicago Trading & Arbitrage, Case No. 98 CH 1363 ***."

¶ 114    A release will not be construed to include claims that were not within the contemplation of the parties. *Carlile*, 271 Ill. App. 3d at 838 (citing *Carona v. Illinois Central Gulf R.R. Co.*, 203 Ill. App. 3d 947, 951 (1990)). " '[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release [citation] or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties.' " *Carlile*, 271 Ill. App. 3d at 839 (quoting *Ainsworth Corp. v. Cenco, Inc.*, 107 Ill. App. 3d 435, 439 (1982)). However, the fact that a claim is not specifically listed in a release does not necessarily preclude that claim from having been within the contemplation of the parties and therefore barred. See, *e.g.*, *Rakowski v. Lucente*, 104 Ill. 2d 317, 323 (1984) ("[t]here is no basis for [the defendant's] argument that the release did not include a specific type of action *** because that right was not expressly enumerated. When employing a release as broad as the one used here, any attempt to list the specific types of action included in the release might have detracted from its broad and general scope."); *Gavery v. McMahon & Elliott*, 283 Ill. App. 3d 484, 488-89 (1996) (rejecting an argument that the plaintiff's specific malpractice claims were not within the contemplation of the parties because he released all claims, which included the malpractice claims); *Chubb v. Amax Coal Co.*, 125 Ill. App. 3d 682, 686 (1984) (finding that the release barred all claims in existence arising under an insurance policy, whether known or unknown). Thus, we consider whether the claims in the consolidated suit were within the contemplation of the parties at the time of the release.

¶ 115    Here, the release contains broad language releasing "all claims, *** known or unknown, which either party hereto now has or ever had." Additionally, the release contains more specific language releasing claims "including those claims asserted in the Verified Complaint for Derivative and Other Relief." We find that the claims here fall under both of these categories.

¶ 116    In the 1998 derivative complaint, IMA alleges that defendants were using CTA's assets to create Archipelago and that Archipelago was CTA's business opportunity. The complaint further contains allegations that Borsellino, Putnam, and Marrgwen Townsend participated in several meetings in which Putnam and Marrgwen Townsend falsely told Borsellino that their efforts and financial contributions would be solely used for the benefit of CTA when, in fact, they were being used for the creation of businesses competing with CTA, including Archipelago. The 1998 complaint also alleges that Marrgwen Townsend and Putnam concealed the fact that they were utilizing CTA's resources for the benefit of Archipelago.

¶ 117    In the 2000 and 2004 complaints, Borsellino alleges that during the settlement negotiations, defendants made misrepresentations concerning whether Archipelago was a business opportunity of CTA and whether CTA's assets were used to benefit Archipelago. He alleges that Putnam told him at the settlement conference that Archipelago "had nothing to do with" CTA and that they were separate businesses. Putnam also denied that any CTA

assets were used to start Archipelago or benefit Archipelago and represented that CTA did not have any monetary value and was failing. By comparing the complaints, it is apparent that defendants' representations and omissions at the settlement conference concerned the same basic issues as alleged by IMA in the 1998 complaint, which were explicitly released. Since the parties were discussing the allegations of the 1998 complaint and explicitly released those, and defendants' representations concerned the same issues as the 1998 complaint, we find that the parties contemplated that the representations concerning CTA and Archipelago made during the settlement conference were released. Accordingly, the release barred Borsellino's claim and we must reverse the judgment of the trial court.

¶ 118                                              B. *Res Judicata*

¶ 119     Since we have determined that Borsellino's claim was barred by the release, we have no need to consider whether it is also barred by *res judicata*, nor do we address any of defendants' other arguments in support of reversal.

¶ 120                                            III. Cross-appeal

¶ 121     In his cross-appeal, Borsellino asks us to reinstate the trial court's award of prejudgment interest, as well as providing a new trial on the issue of punitive damages. However, since we have determined that the trial court's judgment must be reversed, we have no need to consider the issues raised in the cross-appeal.

¶ 122                                              CONCLUSION

¶ 123     For the reasons set forth above, we find that Borsellino had standing to bring suit in the consolidated cases but that the settlement agreement and release barred his claims.

¶ 124     Reversed.